

FILED

DEC 1 2 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK

1  McGREGOR W. SCOTT
   United States Attorney
2  MICHAEL D. ANDERSON
   MATTHEW M. YELOVICH
3  KEVIN C. KHASIGIAN
   Assistant United States Attorneys
4  501 I Street, Suite 10-100
   Sacramento, CA 95814
5  Telephone: (916) 554-2700
   Facsimile:  (916) 554-2900
6
   Attorneys for Plaintiff
7  United States of America

8                    IN THE UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,            CASE NO. 2:18-CR-0253 GEB

12                       Plaintiff,      PLEA AGREEMENT

13            v.

14  JEFFREY R. DAVID,

15                      Defendant.

16

17                    **I.    INTRODUCTION**

18      A.    **Scope of Agreement.**

19          The information in this case charges the defendant with violations of 18 U.S.C. § 1343 – Wire

20  Fraud (Counts 1 and 2), 18 U.S.C. § 1957 – Money Laundering (Counts 3 through 10), and 18 U.S.C.

21  § 1028A(a)(1) – Aggravated Identity Theft (Count 11).  This document contains the complete plea

22  agreement between the United States Attorney's Office for the Eastern District of California (the

23  "government") and the defendant regarding this case.  This plea agreement is limited to the United

24  States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or

25  local prosecuting, administrative, or regulatory authorities.

26      B.    **Court Not a Party.**

27          The Court is not a party to this plea agreement.  Sentencing is a matter solely within the

28  discretion of the Court, and the Court may take into consideration any and all facts and circumstances

   PLEA AGREEMENT                              1

1   concerning the criminal activities of defendant, including activities which may not have been charged in

2   the information.  The Court is under no obligation to accept any recommendations made by the

3   government, and the Court may in its discretion impose any sentence it deems appropriate up to and

4   including the statutory maximum stated in this plea agreement.

5     If the Court should impose any sentence up to the maximum established by the statute, the

6   defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all

7   of the obligations under this plea agreement.  The defendant understands that neither the prosecutor,

8   defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will

9   receive.

10      **II.**   **DEFENDANT'S OBLIGATIONS**

11    **A.**  **Guilty Plea.**

12    The defendant will plead guilty to Count 1 (Wire Fraud) and Count 11 (Aggravated Identity

13  Theft).  The defendant agrees that he is in fact guilty of these charges and that the facts set forth in the

14  Factual Basis for Plea attached hereto as Exhibit A are accurate.

15    The defendant agrees that this plea agreement will be filed with the Court and become a part of

16  the record of the case.  The defendant understands and agrees that he will not be allowed to withdraw his

17  plea(s) should the Court not follow the government's sentencing recommendations.

18    The defendant agrees that the statements made by him in signing this Agreement, including the

19  factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by

20  the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a

21  guilty plea pursuant to this Agreement.  The defendant waives any rights under Fed. R. Crim. P. 11(f)

22  and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this

23  Agreement generally.

24     1.  Waiver of Indictment:

25    The defendant acknowledges that under the United States Constitution he is entitled to be

26  indicted by a grand jury on the charges to which he is pleading guilty and that pursuant to Fed. R. Crim.

27  P. 7(b) he agrees to waive any and all rights he has to being prosecuted by way of indictment to the

28  charges set forth in the information.  The defendant agrees that at a time set by the Court, he will sign a

PLEA AGREEMENT       2

1   written waiver of prosecution by Indictment and consent to proceed by Information rather than by

2   Indictment.

3       **B.   Restitution.**

4           The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of

5   certain offenses.  Defendant agrees that his conduct is governed by the Mandatory Restitution Act

6   pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims

7   affected by this offense, including, but not limited to, the victims covered in the factual basis, victims

8   covered in those counts to be dismissed as part of the plea agreement pursuant to 18 U.S.C.

9   § 3663A(a)(3), other victims as a result of the defendant's conduct for the offenses charged from the

10  periods of 2012 through 2018, and victim expenses cognizable under 18 U.S.C. § 3663A(b)(4).  The

11  amount of restitution identified by the parties to date will be at least approximately $13,429,000 dollars,

12  which does not include any victim expenses cognizable under 18 U.S.C. § 3663A(b)(4) that will be

13  calculated and presented prior to sentencing.  The defendant understands and agrees that he will be

14  responsible for restitution amounts presented by victims in excess of the currently identified amount

15  insofar as those amounts identified by victims are cognizable expenses under restitution statutes and

16  case law.

17          Defendant further agrees that he will not seek to discharge any restitution obligation or any part

18  of such obligation in any bankruptcy proceeding.  Payment of restitution shall be by cashier's or

19  certified check made payable to the Clerk of the Court.  The defendant understands that this plea

20  agreement is voidable at the option of the government if he fails to pay the stipulated restitution prior to

21  his scheduled court appearance for sentencing.

22      **C.   Fine.**

23          The defendant reserves the right to argue to Probation and at sentencing that he is unable to pay a

24  fine, and that no fine should be imposed.  The defendant understands that it is his burden to affirmatively

25  prove that he is unable to pay a fine, and agrees to provide a financial statement under penalty of perjury

26  to the Probation Officer and the government in advance of the issuance of the draft Presentence

27  Investigation Report, along with supporting documentation.  The government retains the right to oppose

28  the waiver of a fine.  If the Court imposes a fine, the defendant agrees to pay such fine if and as ordered

PLEA AGREEMENT                                    3

1 | by the Court, up to the statutory maximum fine for the defendant's offenses.

2 | **D.** **Special Assessment.**

3 | The defendant agrees to pay a special assessment of $200 at the time of sentencing by delivering

4 | a check or money order payable to the United States District Court to the United States Probation Office

5 | immediately before the sentencing hearing. The defendant understands that this plea agreement is

6 | voidable at the option of the government if he fails to pay the assessment prior to that hearing.

7 | **E.** **Violation of Plea Agreement by Defendant/Withdrawal of Plea(s).**

8 | If the defendant violates this plea agreement in any way, withdraws his plea, or tries to withdraw

9 | his plea, this plea agreement is voidable at the option of the government. If the government elects to

10 | void the agreement based on the defendant's violation, the government will no longer be bound by its

11 | representations to the defendant concerning the limits on criminal prosecution and sentencing as set

12 | forth herein. A defendant violates the plea agreement by committing any crime or providing or

13 | procuring any statement or testimony which is knowingly false, misleading, or materially incomplete in

14 | any litigation or sentencing process in this case, or engages in any post-plea conduct constituting

15 | obstruction of justice. Varying from stipulated Guidelines application or agreements regarding

16 | arguments as to Title 18, United States Code, Section 3553, as set forth in this agreement, personally or

17 | through counsel, also constitutes a violation of the plea agreement. The government also shall have the

18 | right (1) to prosecute the defendant on any of the counts to which he pleaded guilty, (2) to reinstate any

19 | counts that may be dismissed pursuant to this plea agreement, and (3) to file any new charges that would

20 | otherwise be barred by this plea agreement. The defendant shall thereafter be subject to prosecution for

21 | any federal criminal violation of which the government has knowledge. The decision to pursue any or

22 | all of these options is solely in the discretion of the United States Attorney's Office.

23 | By signing this plea agreement, the defendant agrees to waive any objections, motions, and

24 | defenses that the defendant might have to the government's decision. Any prosecutions that are not

25 | time-barred by the applicable statute of limitations as of the date of this plea agreement may be

26 | commenced in accordance with this paragraph, notwithstanding the expiration of the statute of

27 | limitations between the signing of this plea agreement and the commencement of any such prosecutions.

28 | The defendant agrees not to raise any objections based on the passage of time with respect to such

1    counts including, but not limited to, any statutes of limitation or any objections based on the Speedy

2    Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as

3    of the date of this plea agreement.  The determination of whether the defendant has violated the plea

4    agreement will be under a probable cause standard.

5         In addition, (1) all statements made by the defendant to the government or other designated law

6    enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal,

7    whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or

8    administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no

9    claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal

10   Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by

11   the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed.

12   By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

13        **F.    Forfeiture.**

14        The defendant agrees to forfeit to the United States voluntarily and immediately all of his right,

15   title, and interest to any and all assets subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28

16   U.S.C. § 2461(c).  Those assets include, but are not limited to, the following:

17             1.    Approximately $398,663.97 seized from Five Star Bank account number
                     2213510, held in the name of Sacramento Sports Partners.
18

19        The defendant agrees that the listed asset constitutes or is derived from proceeds traceable to a

20   violation of 18 U.S.C. § 1343.

21        The defendant agrees to fully assist the government in the forfeiture of the listed asset and to take

22   whatever steps are necessary to pass clear title to the United States.  The defendant shall not sell,

23   transfer, convey, or otherwise dispose of any of his assets, including but not limited to, the above-listed

24   asset.

25        The defendant agrees not to file a claim to any of the listed property in any civil proceeding,

26   administrative or judicial, which may be initiated.  The defendant agrees to waive his right to notice of

27   any forfeiture proceeding involving this property, and agrees to not file a claim or assist others in filing a

28

1    claim in that forfeiture proceeding.

2       The defendant knowingly and voluntarily waives his right to a jury trial on the forfeiture of

3 assets. The defendant knowingly and voluntarily waives all constitutional, legal and equitable defenses

4 to the forfeiture of these assets in any proceeding. The defendant agrees to waive any jeopardy defense,

5 and agrees to waive any claim or defense under the Eighth Amendment to the United States

6 Constitution, including any claim of excessive fine, to the forfeiture of the assets by the United States,

7 the State of California or its subdivisions. The defendant waives oral pronouncement of forfeiture at the

8 time of sentencing, and any defenses or defects that may pertain to the forfeiture.

9       The defendant agrees to sign a Stipulation for Final Judgment of Forfeiture in *U.S. v. Real*

10 *Property Known as APN: 4181-034-009, et al.*, 2:18-CV-02328-WBS-KJN, forfeiting to the United

11 States all of his right, title, and interest in the net proceeds in lieu of the two real properties. The

12 stipulation must be signed concurrently with the signing of this plea agreement.

13       The parties agree that if any portion of the net proceeds from the forfeited assets are paid to

14 victims through the remission or restoration process, that amount will be credited to the defendant's

15 restitution obligation.

16    **G.**      **Asset Disclosure.**

17       The defendant agrees to make a full and complete disclosure of his assets and financial

18 condition, and will complete the United States Attorney's Office's "Authorization to Release

19 Information" and "Financial Affidavit" within five (5) weeks from the entry of the defendant's change

20 of plea, including supporting documentation. The defendant also agrees to have the Court enter an order

21 to that effect. The defendant understands that if he fails to complete truthfully and provide the described

22 documentation to the United States Attorney's office within the allotted time, he will be considered in

23 violation of the agreement, and the government shall be entitled to the remedies set forth in section II.E

24 above, above.

25      **III.**      **THE GOVERNMENT'S OBLIGATIONS**

26    **A.**      **Dismissals/Other Charges.**

27       The government agrees to move, at the time of sentencing, to dismiss without prejudice the

28 remaining counts in the pending information and not to bring any other charges arising from the conduct

PLEA AGREEMENT          6

1  outlined in the Factual Basis attached hereto as Exhibit A.  The government also agrees not to reinstate

2  any dismissed count except if this agreement is voided as set forth herein, or as provided in paragraphs

3  II.E (Violation of Plea Agreement by Defendant/Withdrawal of Plea(s)), VI.B (Estimated Guideline

4  Calculation), and VII.B (Waiver of Appeal and Collateral Attack) herein.

5      **B.      Recommendations.**

6          1.      Incarceration Range.

7          The government will recommend that the defendant be sentenced to the low end of the

8  applicable guideline range (including the application of the mandatory statutory minimum term) as

9  determined by the Court.

10          2.      Acceptance of Responsibility.

11          The government will recommend a two-level reduction (if the offense level is less than

12  16) or a three-level reduction (if the offense level reaches 16) in the computation of his offense level if

13  the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G.

14  § 3E1.1.  This includes the defendant meeting with and assisting the probation officer in the preparation

15  of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise

16  engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either

17  in the preparation of the pre-sentence report or during the sentencing proceeding.

18      **C.      Use of Information for Sentencing.**

19          The government is free to provide full and accurate information to the Court and Probation,

20  including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate

21  statements or arguments by the defendant, his attorney, Probation, or the Court.  The defendant also

22  understands and agrees that nothing in this Plea Agreement bars the government from defending on

23  appeal or collateral review any sentence that the Court may impose.

24      **IV.      ELEMENTS OF THE OFFENSE**

25          At a trial, the government would have to prove beyond a reasonable doubt the following

26  elements of the offenses to which the defendant is pleading guilty, Wire Fraud and Aggravated Identity

27  Theft:

28          *Wire Fraud, 18 U.S.C. § 1343*

PLEA AGREEMENT                                  7

First, the defendant knowingly devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

Third, the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and

Fourth, the defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

*Aggravated Identity Theft; 18 U.S.C. § 1028A(a)(1)*

First, the defendant knowingly possessed and used without legal authority a means of identification of another person;

Second, the defendant knew that the means of identification belonged to a real person; and

Third, the defendant did so during and in relation to wire fraud.

The defendant fully understands the nature and elements of the crimes charged in the information to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V.    **MAXIMUM SENTENCE**

### A.    **Maximum Penalty.**

For Count One (Wire Fraud), the maximum sentence that the Court can impose is 20 years of incarceration, a fine of $250,000, a three-year period of supervised release and a special assessment of $100. For Count Eleven (Aggravated Identity Theft), the Court is required to impose a sentence of 24 months of incarceration consecutive to any other sentence imposed for Count One, and may impose a fine of up to $250,000, a one-year period of supervised release, and a $100 special assessment. By signing this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution

PLEA AGREEMENT                                    8

1  order is not restricted to the amounts alleged in the specific counts to which he is pleading guilty. The

2  defendant further agrees, as noted above, that he will not attempt to discharge in any present or future

3  bankruptcy proceeding any restitution imposed by the Court.

4  **B.** **Violations of Supervised Release.**

5  The defendant understands that if he violates a condition of supervised release at any time during

6  the term of supervised release, the Court may revoke the term of supervised release and require the

7  defendant to serve up to 2 additional years of imprisonment.

8  **VI.** **SENTENCING DETERMINATION**

9  **A.** **Statutory Authority.**

10  The defendant understands that the Court must consult the Federal Sentencing Guidelines and

11  must take them into account when determining a final sentence. The defendant understands that the

12  Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the

13  Sentencing Guidelines and must take them into account when determining a final sentence. The

14  defendant further understands that the Court will consider whether there is a basis for departure from the

15  guideline sentencing range (either above or below the guideline sentencing range) because there exists

16  an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into

17  consideration by the Sentencing Commission in formulating the Guidelines. The defendant further

18  understands that the Court, after consultation and consideration of the Sentencing Guidelines, must

19  impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

20  **B.** **Stipulations Affecting Guideline Calculation.**

21  The government and the defendant agree that there is no material dispute as to the following

22  sentencing guidelines variables and therefore stipulate to the following:

23         1.    Base Offense Level: 7 (U.S.S.G. § 2B1.1(a)(1))

24         2.    Loss Amount: +20 (U.S.S.G. § 2B1.1(b)(1)(K), the parties stipulate to a loss amount of at least approximately $13,429,000.)

25

26         3.    Specific Offense Characteristics:

27

28

PLEA AGREEMENT         9

a.   Sophisticated means: +2 (U.S.S.G. § 2B1.1(b)(10)(C): the offense involved sophisticated means including the defendant's use of a shell entity, fraudulent invoices and forged executive signatures, creation of tax documents and business registration documents for the appearance of legitimacy);

b.   Gross receipts from financial institution in excess of $1,000,000: +2 (U.S.S.G. § 2B1.1(b)(16)(A): the defendant derived approximately $9,000,000 from Company B, a credit union falling within the definition of "financial institution" provided in U.S.S.G. § 2B1.1 app. n. 1).

4.   Adjusted Offense Level: 31

5.   Acceptance of Responsibility: See paragraph III.B.2 above

6.   Estimated Criminal History: The parties estimate, but do not stipulate, that the defendant's criminal history category will be I.

7.   Departures: None.

8.   Estimated Sentencing Range: The parties estimate, but do not stipulate, that the defendant's U.S.S.G. sentencing range will be 78–97 months of imprisonment plus 24 months consecutive for the aggravated identity theft count. (The defendant understands that if the criminal history category differs from the parties' estimate, his Guidelines sentencing range may differ from that set forth here.)

9.   Departures or Other Enhancements or Reductions:

The defendant is free to recommend to the Court whatever sentence he believes is appropriate under 18 U.S.C. § 3553(a). The government is not obligated to recommend any specific sentence, consistent with its obligation to recommend a sentence at the low end of the applicable guideline range (including the application of the mandatory statutory minimum term) as determined by the Court.

## VII.   WAIVERS

### A.   Waiver of Constitutional Rights.

The defendant understands that by pleading guilty he is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to testify on his behalf; (e) to confront and cross-examine witnesses against him; and (f) not to be compelled to incriminate himself.

### B.   Waiver of Appeal and Collateral Attack.

The defendant understands that the law gives the defendant a right to appeal his guilty plea,

PLEA AGREEMENT          10

1  conviction, and sentence. The defendant agrees as part of his plea(s), however, to give up the right to

2  appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not

3  exceed the statutory maximums for the offenses to which he is pleading guilty. The defendant

4  specifically gives up the right to appeal any order of restitution the Court may impose.

5  Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if

6  one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the

7  statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant

8  understands that these circumstances occur infrequently and that in almost all cases this Agreement

9  constitutes a complete waiver of all appellate rights.

10  In addition, regardless of the sentence the defendant receives, the defendant also gives up any

11  right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any

12  aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

13  Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever

14  attempts to vacate his plea(s), dismiss the underlying charges, or modify or set aside his sentence on any

15  of the counts to which he is pleading guilty, the government shall have the rights set forth in Section II.E

16  herein.

17  **C.** **Waiver of Attorneys' Fees and Costs.**

18  The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-

19  119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the

20  investigation and prosecution of all charges in the above-captioned matter and of any related allegations

21  (including without limitation any charges to be dismissed pursuant to this plea agreement and any

22  charges previously dismissed).

23  **D.** **Impact of Plea on Defendant's Immigration Status.**

24  Defendant recognizes that pleading guilty may have consequences with respect to his

25  immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes

26  are removable offenses, including offense(s) to which the defendant is pleading guilty. The defendant

27  and his counsel have discussed the fact that the charges to which the defendant is pleading guilty are

28  aggravated felonies, or crimes that are likely to be determined to be aggravated felonies under 8 U.S.C.

PLEA AGREEMENT                                11

1 | § 1101(a)(43); and that while there may be arguments that defendant can raise in immigration

2 | proceedings to avoid or delay removal, it is virtually certain that defendant will be removed. Removal

3 | and other immigration consequences are the subject of a separate proceeding, however, and defendant

4 | understands that no one, including his attorney or the district court, can predict to a certainty the effect

5 | of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty

6 | regardless of any immigration consequences that his plea may entail, even if the consequence is his

7 | automatic removal from the United States.

## VIII. ENTIRE PLEA AGREEMENT

9 | Other than this plea agreement, no agreement, understanding, promise, or condition between the

10 | government and the defendant exists, nor will such agreement, understanding, promise, or condition

11 | exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and

12 | counsel for the United States.

## IX. APPROVALS AND SIGNATURES

### A. Defense Counsel.

15 | I have read this plea agreement and have discussed it fully with my client. The plea agreement

16 | accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to

17 | plead guilty as set forth in this plea agreement.

18 | Dated:

19 | MARC SEITLES
   | MARK REICHEL

20 | Attorneys for Defendant

### B. Defendant:

23 | I have read this plea agreement and carefully reviewed every part of it with my attorney. I

24 | understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully

25 | understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my

26 | case. No other promises or inducements have been made to me, other than those contained in this plea

27 | agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement.

28 | Finally, I am satisfied with the representation of my attorney in this case.

PLEA AGREEMENT      12



Dated: 12/12/18

JEFFREY R. DAVID
Defendant

C. **Attorney for United States**

I accept and agree to this plea agreement on behalf of the government.

Dated:

McGREGOR W. SCOTT
United States Attorney

MICHAEL D. ANDERSON
MATTHEW M. YELOVICH
KEVIN C. KHASIGIAN
Assistant United States Attorneys

PLEA AGREEMENT

https://mail.google.com/mail/u/0/#inbox/FMfcgxvzMBpzBKxqkNxcsFvDLsZqrTBCW?projector=1&messagePartId=0.1

IMG_4487.JPG

1

Dated:

2

_____

JEFFREY R. DAVID
Defendant

3

4

**C.**     **Attorney for United States:**

I accept and agree to this plea agreement on behalf of the government.

5

6

Dated: Dec. 12, 2018

McGREGOR W. SCOTT
United States Attorney

7

8

_____

MICHAEL D. ANDERSON
MATTHEW M. YELOVICH
KEVIN C. KHASIGIAN
Assistant United States Attorneys

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEA AGREEMENT

13

1              EXHIBIT "A"

2              Factual Basis for Plea(s)

3          Witness statements, bank and business records, electronic communications, and the defendant's

4     own statements establish the following facts regarding Jeffrey R. David's conduct.

5          **Overview**

6          From at least October 2012 through July 2016, Jeffrey R. David devised and executed a scheme

7     to solicit payments ostensibly on behalf of his employer from other businesses, when in fact he

8     personally received such payments without his employer's knowledge or authorization. Among other

9     roles, David served as the Chief Revenue Officer of Company A, a professional sports franchise in

10    Sacramento, California. As part of his duties, David directly negotiated sponsorship, partnership, and

11    other advertising and marketing agreements with companies in California and elsewhere who wished to

12    pay Company A for the display of those businesses' names, logos, and advertisements in various

13    locations under Company A's control. While David represented that the payments being made by these

14    companies pursuant to these agreements were going to Company A, in fact he was directing some of

15    these companies to wire some of their payments to bank accounts held in the name of a limited liability

16    company under his sole control. In total, David's scheme caused at least five companies in California

17    and elsewhere to part with approximately $13,429,000 in payments intended for Company A.

18         To accomplish his scheme, in 2009, David formed Sacramento Sports Partners, which he

19    converted to a limited liability company in 2015. Using this entity, David then opened bank accounts at

20    a regional bank in Rocklin, California, over which he was the sole signatory, and a set of mailboxes at a

21    commercial mailbox store located in Natomas, California. David then proceeded to negotiate with

22    counterparties to Company A and enter into agreements or modifications to agreements purportedly on

23    Company A's behalf while directing the proceeds to Sacramento Sports Partners, LLC's bank accounts

24    at the regional bank.

25         **Initial Fraudulent Conduct**

26         At first, David defrauded relatively lower dollar value sponsors of Company A by drafting

27    invoices on Company A's letterhead and sending the invoices to those sponsors, listing Sacramento

28    Sports Partners and the address of David's commercial mailboxes in Natomas as the actual entity billing

PLEA AGREEMENT                    A-1

1  the recipient.  These invoices had the effect of misleading the recipient sponsors into believing that

2  Company A was billing them for advertising, when in fact the sponsors were paying accounts under

3  David's sole control for services not rendered.  For example, on or about October 23, 2012, David sent

4  an invoice on Company A letterhead to a sports advertising agency in New York, New York, listing a

5  purported 2012–13 partnership between Company A and Company X totaling $20,000, due January 31,

6  2013.  In fact, Company A had not authorized David to bill Company X for $20,000, and Company A

7  had no knowledge that Company X was paying David or Sacramento Sports Partners, LLC, such money.

8  Likewise, on or about January 29, 2013, David sent the same sports advertising agency in New York,

9  New York, an invoice on Company A letterhead listing a 2012–13 partnership between Company A and

10  Companies Y and Z for $4,500 each, totaling $9,000 due March 15, 2013.  In fact, Company A had not

11  authorized David to bill Company Y or Company Z for $4,500 each, and Company A had no knowledge

12  that Company Y and Company Z were paying David or Sacramento Sports Partners, LLC, such money.

13  **Original Naming Rights and Sponsorship Agreements**

14  Following these initial successes, David targeted higher value sponsors of Company A to

15  defraud.  In September 2016, Company A opened a new indoor arena and practice facility in downtown

16  Sacramento.  Before doing so, Company A solicited regional and national businesses for bids to obtain

17  naming rights to the new stadium and practice facility.  David was tasked with soliciting these potential

18  partners, and negotiating the eventual sponsorship agreements with the winning bidders.

19  Company B, a credit union with accounts insured by the National Credit Union Administration,

20  won naming rights to the new indoor arena, and entered into a naming rights and sponsorship agreement

21  with a limited partnership representing Company A on June 12, 2015 (herein, the "Company B Original

22  Agreement").  The Company B Original Agreement involved various terms regarding marketing, use of

23  marks, and benefits accruing to Companies A and B.  As a part of the agreement, Company B agreed to

24  pay Company A "rights fees" of $110,000,000 over 20 years.  These rights fees were payable on July 1

25  of each contract year, with the annual amount being $6,000,000 for years 1 through 3, $5,500,000 for

26  years 4 through 17, and $5,000,000 for years 18 through 20.  David negotiated large parts of the

27  Company B Original Agreement with counterparts at Company B, and had knowledge of the rights fees

28  schedule and amounts.

PLEA AGREEMENT                              A-2

1    Company C, a not-for-profit health plan headquartered in Oakland, California, won naming

2    rights to the new practice facility, and entered into a sponsorship agreement with a limited partnership

3    representing Company A in August 2015 (herein, the "Company C Original Agreement"). The

4    Company C Original Agreement involved various terms regarding marketing, use of marks, and benefits

5    accruing to Companies A and C, as well as certain exhibits outlining separate terms, such as leases,

6    provision of healthcare services, and payment terms.  As a part of "Exhibit B" to the agreement,

7    Company C agreed to pay Company A "sponsorship payments" of $2,800,000 per year for 10 years.

8    These rights fees were payable on October 1 of each contract year.  David negotiated large parts of the

9    Company C Original Agreement with counterparts at Company C, and had knowledge of the

10    sponsorship payments schedule and amounts.

11    **"Amending" the Original Agreements**

12    David exploited these initial agreements to his advantage by negotiating "amendments" directly

13    with Companies B and C, purportedly on Company A's behalf but in fact without the authorization or

14    knowledge of Company A.  First, negotiating directly with counterparts at Company B, David suggested

15    amending the Company B Original Agreement by providing for an initial payment of $9,000,000 from

16    Company B to Company A, in exchange for lower payments in later years in the agreement, as well as

17    other assorted benefits regarding tickets and parking at the new Company A arena.  Company B agreed,

18    and the Company B Original Agreement was modified without the knowledge or authorization of

19    anyone at Company A beyond David.  Specifically, the Company B Original Agreement's payment

20    schedule was modified so that the following payments were now required:  an initial $9,000,000

21    payment on July 1, 2016; $6,000,000 for years 1 through 3, $5,500,000 for years 4 through 8,

22    $5,000,000 for years 9 through 13, $4,500,000 for years 14 through 18, and $4,000,000 for years 19 and

23    20.  The president and chief executive officer of Company B signed the amendment under the false

24    pretense that Company A had authorized David to negotiate it.  On approximately June 30, 2016, David

25    signed the amendment on behalf of Company A, forging the signature of Company A's team president

26    at the time, whom David knew to be a real person and who did not authorize such use of his name or

27    signature.

28

1    The new $9,000,000 initial payment from Company B to Company A did not go to Company A,

2  but instead to accounts controlled by David.  On July 5, 2016, Company B wired $9,000,000 to account

3  ending x1761 held in the name of Sacramento Sports Partners, LLC, controlled exclusively by David.

4  Company A did not know about or authorize this financial transaction, and Company B wired the funds

5  under the false pretense that such funds were being sent to an LLC under the control of Company A.

6    Similarly, David acted to alter the terms of the Company C Original Agreement without the

7  knowledge or authorization of anyone at Company A beyond himself, and without Company C knowing

8  that Company A had not authorized the changes.  Specifically, David substituted a modified "Exhibit B"

9  into the Company C Original Agreement, which made two material changes to the terms for Company

10  C's payments to Company A:  (1) in lieu of any contemplated inflation of its annual payments over time,

11  Company C was now obligated to "make an advance payment of $4,400,000 to" Company A "within 30

12  days after the date of this Agreement," and (2) the payment was to be made to "Sacramento Sports

13  Partners, LLC, an affiliate of" Company A.  In fact, Sacramento Sports Partners was not an affiliate of

14  Company A, but instead an LLC created and controlled exclusively by David.  Immediately after

15  substituting this unauthorized "Exhibit B" into the agreement between Company A and Company C,

16  David created a false invoice using Company A letterhead, which he sent to Company C at their

17  Oakland headquarters address.  The invoice is dated August 19, 2015, with a sending entity of

18  "Sacramento Sports Partners" listed at the Natomas commercial mailbox address.  The invoice bills

19  Company C for $4,400,000, described as Company A "Advance Payment Partnership," due thirty days

20  from the invoice date.  On September 18, 2015, Company C wired $4,400,000 to Sacramento Sports

21  Partners, LLC's bank account ending x1761 at the regional bank, for which David was the sole

22  signatory.

23    David used the means of identification of other people—whom he knew were real people—

24  without their authorization to carry out his fraud scheme.  In addition to the unauthorized use of

25  Company A's team president's name described above (forging his signature on the amendment to the

26  Company B Original Agreement), David forged the signature of Company B's president and chief

27  executive officer on LLC authorization documents on June 27, 2016, and did the same for a purported

28  executive at Company C on the same date.  David knew that both of these individuals were in fact real

PLEA AGREEMENT                        A-4

| Approx. Date | Description of Monetary Transaction |
|---|---|
| Dec. 3, 2015 | $360,000 wire transfer from account ending x1761 to Escrow Company 1 |
| June 27, 2016 | $240,000 wire transfer from account ending x1761 to Escrow Company 1 |
| July 13, 2016 | $7,781,073.04 wire transfer from account ending x1761 to Escrow Company 2 |
| July 13, 2016 | $100,000 wire transfer from account ending x1761 to private jet membership company |
| Sept. 20, 2016 | $38,475.49 ACH payment from account ending x1761 to American Express |
| Nov. 9, 2016 | $90,394.06 ACH payment from account ending x1761 to American Express |
| Dec. 22, 2016 | $28,250.82 ACH payment from account ending x1761 to American Express |
| Apr. 25, 2017 | $14,021.08 ACH payment from account ending x1761 to American Express |

As David solely controlled the fraud proceeds and the accounts held by Sacramento Sports Partners, LLC, at the regional bank, these expenditures were only a selection of those made by him from 2015 through 2018 using the proceeds of his wire fraud scheme.

**[Remainder of Page Left Intentionally Blank]**

1  people, and the signatures were made in furtherance of laundering the proceeds of the fraud scheme, as

2  described below.  Furthermore, as described in further detail below, David created false letters on

3  Company B and Company C letterhead purporting to authorize real estate purchases on those

4  companies' behalf, and forging the signatures of two additional individuals whom David in fact knew to

5  be real people.  None of these individuals knew about or authorized David's use of their means of

6  identification.

7  ### David's Real Estate Purchases and Monetary Transactions Using Fraud Proceeds

8  David used the approximately $13.4 million from his fraud on Company B and Company C to

9  purchase real estate in Southern California in the name of Sacramento Sports Partners, LLC, without the

10  knowledge or consent of Company A, Company B, or Company C.  On June 20, 2016, David wired

11  $240,000.00 from the Sacramento Sports Partners, LLC, account ending x1761 to Palm West Escrow for

12  the purchase of Property 1 in Hermosa Beach, California.  On July 13, 2016, David wired an additional

13  $7,781,073.04 from the Sacramento Sports Partners, LLC, account ending x1761 to Palm West Escrow

14  for the purchase of Property 1.  The Property 1 transaction closed on July 14, 2016, with a sales price of

15  $8,021,073.04, titled under Sacramento Sports Partners, LLC.

16  Similarly, on December 3, 2015, David wired $360,000.00 from the Sacramento Sports Partners,

17  LLC, account ending x1761, to Peninsula Escrow for the purchase of Property 2 in Manhattan Beach,

18  California.  On June 27, 2016, David wired an additional $3,450,066.75 to Peninsula Escrow for the

19  purchase of Property 2.  The Property 2 transaction closed on June 28, 2016, with a sales price of

20  $3,810,066.75, titled under Sacramento Sports Partners, LLC.

21  These were not the only expenditures made out of the fraud proceeds:  David paid $100,000 to a

22  private jet company on July 13, 2017; paid expenses related to improving properties he owned,

23  including Property 1 and Property 2; paid tens of thousands of dollars in personal credit card bills; wrote

24  checks to family and for personal goods and services; and otherwise used the account for personal

25  expenses.  Among other monetary transactions that David caused using proceeds he knew were from the

26  fraud were the following:

27  ///

28  ///

PLEA AGREEMENT                          A-5



**David's August 27, 2018 Call with Company A Employee**

David left Company A in 2016, and was hired at another confidential equity franchise. On August 27, 2018, at the request of agents from the Federal Bureau of Investigation, an employee of Company A made a consensually recorded call to David ostensibly to discuss matters unrelated from his former employment with Company A. The employee at Company A asked David about certain digitally-stored files that David had left behind at Company A related to David's fraud scheme, held in a folder titled "TurboTax." David said: "You can— it's nothing. You can trash it or keep it or whatever you need to do, but it's nothing. This— it's nothing." The employee said: "OK, and would [President of Company A] need to see that at all, or would I need to get that to anybody else?" David replied: "No, it has nothing to do with [Company A]." The employee responded: "OK, OK, sounds good. OK. Do you want me to send it to you or should I just dump it?" David said: "I mean it's not, it's not an entity that's around anymore. You can just throw it away." The employee asked: "There is nothing?" David said: "Yeah, it's nothing. That was something, I can't remember what I was doing. That was in 2015 I think I was trying to figure out taxes, TurboTax." The employee said: "OK. OK. Well... I think, is there anything else in your drive that you would need at this point or is it OK if we just dump everything?" David responded: "I think you can dump everything."

*        *        *

I, Jeffrey K. David, have carefully reviewed the above Exhibit A: Factual Basis for Plea with my attorneys. The facts described above are true and correct and I adopt that Factual Basis for Plea as my own true statement.

Dated: 12/12/18

Jeffrey K. David
Defendant

FLEA AGREEMENT