MARK J. REICHEL, State Bar #155034
455 CAPITOL MALL, 8th FLOOR, Suite 802
Sacramento, California 95814
Telephone: (916) 498-9258
FAX: (888) 567-2949
www.reichellaw.com

MARC DAVID SEITLES, ESQ.
ASHLEY LITWIN, ESQ.
SEITLES & LITWIN
40 NW 3rd St
Miami, FL 3312
(305) 403-8070
www.seitleslaw.com

Attorneys for Defendant
JEFFREY R. DAVID

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:18-cr-00253-WBS |
| Plaintiff, | ) | **DEFENSE SENTENCING** |
| | ) | **MEMORANDUM WITH FORMAL** |
| v. | ) | **OBJECTIONS** |
| | ) | |
| | ) | Date: July 27, 2015 |
| JEFFREY R. DAVID | ) | Time: 9:00 a.m. |
| | ) | Judge: WILLIAM B. SHUBB |
| Defendant. | | |

Defendant Jeffery David, by and through his undersigned counsel, submits his formal objection to the Pre-Sentence Report and this Sentencing Memorandum.

Mr. David asks this Court to consider that there was no actual or intended loss in this case, the sentences imposed in similar cases where there was no actual loss, his extraordinary acceptance of responsibility, his lifetime of helping the

community, and his close relationship with his family, in fashioning a sentence that is sufficient but not greater than necessary.

Here, the community and the purposes of punishment will be best served by a sentence of 2 years of incarceration combined with a lengthy term of release on electronic monitoring or house arrest, an appropriate amount of hours of community service, along with whatever appropriate terms of probation the Court determines.

## I. Procedural Background

On January 22, 2019 Mr. David pled guilty, pursuant to a plea agreement, to Wire Fraud, in violation of 18 U.S.C. § 1343 and Aggravated Identity Theft in violation of 18 U.S.C. § 1028A(a)(1).

## FORMAL OBJECTIONS

## I. OFFENSE LEVEL COMPUTATION: Paragraph 30

Mr. David objects to the imposition of the abuse of trust enhancement under §3B1.1. Mr. David should not be given the enhancement for Abuse of Trust. The government is not seeking the enhancement and argues that it does not apply.

The Ninth Circuit requires that the "party" seeking to enhance a sentence bear the burden of persuasion, with real evidence. *United States v. Snipe*, 515 F.3d 947 (9th Cir 2008); *United States v. Howard*, 849 F.2d 1045 (9th Cir. 1990); *United States v. Joetzki*, 952 F.2d 1090 (9th Cir. 1991). When a defendant raises objections to the enhancement like this, the Government bears the burden of proof to establish the factual predicate for the court's determination. *Snipe* at 955. Here,

the Government specifically does not seek this enhancement, and it has objected to the application of the enhancement. Thus, as the "party" seeking the enhancement who bears the burden of proof and persuasion on the enhancement, because the government is not seeking it, this enhancement cannot apply.

Additionally, the enhancement does not apply because Mr. David did not hold a position of "private trust." The relevant portion of the enhancement reads:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.

U.S.S.G. § 3B1.3.  The Application Notes explain:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3, n.1.

There must first be a position of trust, and it must then also facilitate the commission or concealment of the offense. Here, Mr. David's position *did not* give him the authority to

facilitate or conceal the offense. As laid out in the PSR, Mr. David negotiated with Golden 1 Credit Union for an illegal initial payment and for the money to be wired to Mr. David's company instead of the Sacramento Kings. In order to modify this agreement, he needed the authorization of both the President of the Sacramento Kings and the President and Chief Executive Officer of Golden 1 Credit Union. PSR at ¶ 11. Mr. David therefore forged the signatures of the President of the Sacramento Kings and the President and Chief Executive Officer of Golden 1 Credit Union. PSR at ¶ 13. Similarly, in order to modify the agreement with Kaiser Permanents for an advance payment and for the payment to be made to Mr. David's company instead of the Sacramento Kings, he had to similarly forge signatures. PSR at ¶ 12, 13.

Thus, Mr. David did not have the power or the discretion to make these changes to the agreements with the sponsors, and therefore he did not have a position of trust. Only the President of the Sacramento Kings and executives at Golden 1 Credit Union and Kaiser Permanents had such authority. As Mr. David had to forge signatures on all the documents for the scheme to work, his position did not aid him in the commission or the concealment of the offense.

## II. FINE OF $50,000

Mr. David objects to the imposition of a $50,000 fine. Mr. David does not have the means to pay such a fine. As noted in the PSR, Mr. David "has a negative monthly cash flow and is currently unemployed." PSR at ¶ 69. The PSR argues that he may be able to pay the fine based on his wife's joint checking

account balance, but that money will be used by his wife to support herself and her family while Mr. David is incarcerated. Mr. David does not have the funds, or the means to earn the funds, to pay such a fine.

## III. SUMMARY OF FORMAL OBJECTIONS: 78-97 months range

* Abuse of Trust enhancement does not apply

* No fine should be applied.

* 28 offense level criminal history category I:78-97 months

**SENTENCING MEMORANDUM**

**FACTORS WARRANTING DEPARTURE AND ADDITIONAL FACTORS UNDER 3553 JUSTIFYING A REDUCED SENTENCE/VARIANCE**

## I. LEGAL BACKGROUND

As is widely known, virtually anything at all, post *Booker*, is a valid issue for the court to consider when imposing a sentence. The Sentencing Reform Act, 18 U.S.C. §3551 et seq., imposes an "overarching instruction" that district courts must select a sentence "sufficient but **not greater than necessary**" to achieve the sentencing goals in section 3553(a)(2). *Kimbrough v. United States*, 128 S. Ct.558, 570 (2007) (emphases added). Those goals include the need for the sentence to (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment, (B) afford adequate deterrence to criminal conduct, © protect the public from further crimes of the defendant, and (D) provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Gall*, at 597, n. 6. To arrive at a sentence that serves

those goals without being *greater than necessary*, the Act directs the judge to consider the many factors listed in §3553(a)(1) - (7). These considerations are more than a laundry list of discrete sentencing factors. They comprise "a tapestry of factors, through which runs an overarching principle," the court's duty "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008).

Section 3553(a)(1) begins with the "broad command" to consider the nature and circumstances of the offense and the history and characteristics of the defendant. The statute also requires judges to consider the types of sentences available by statute, section 3553(a)(3), including "sentences other than imprisonment," such as probation. *See Gall*, *id.*, and at 595-596 and n.4, 602 (probationary sentence reflected consideration of types of sentence available, and discussing probation as substantial restriction on freedom based on conditions of supervision).

The Supreme Court envisions that a district court will always consider arguments that the Guideline sentence should not apply because the guideline itself fails properly to reflect Section 3553(a) considerations, reflects an unsound judgment, does not treat defendant characteristics in the proper way, or that a different sentence is appropriate regardless. *Rita*, at 2468. Along with this, the Court places **nothing off-limits for district courts**. All the Guidelines are advisory and a judge may determine that any within Guidelines sentence is "greater than necessary" to serve the objectives of

sentencing. *Kimbrough*, 128 S.C. at 564. District courts may not simply defer to policies of the Commission. *Rita*.

A perfect example comes from *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012). There, the defendants were responsible for a 5.2 million dollar loss. They went to trial. Their sentences were 3 years probation, 6 months home confinement and 1,000 hours community service. The reasons set forth were because of family circumstances, the fact they repented after their trial, and just plainly; incarceration would not be the best sentence for the defendants or society as a whole. The *Prosperi* opinion is an excellent discussion of sentencing law and is exactly on point as to what sentences can and should be fashioned after *Booker*.

## II. A Below Guidelines sentence in this case serves the interests of justice and the 3553 factors.

This case is extremely unique. While there is no net loss, Mr. David's advisory guidelines are extremely high, even there was no actual or even an intended loss in this case. As to any "actual loss," the government is currently in possession of ***all*** the missing funds, before there is even a restitution order, and Mr. David always intended on returning the original money to its rightful owner and therefore there is arguably no intended loss either. But Mr. David pled guilty to a plea agreement which included *all of the money taken*, regardless of whether it is legally "loss," because Mr. David has true remorse for what he has done and is accepting his responsibility.

Since his crime was discovered, Mr. David has done everything humanly possible to right these wrongs: he flew to Sacramento the moment the U.S. Attorney's Office asked him, he cooperated at his own expense with investigators to make sure this could never happen again, and he worked with a real estate agent to make sure the Sacramento Kings and their sponsors recovered all of their money. He also took responsibility personally, driving to Ohio to face the consequences in person and tell his family and friends what he did; and he has been working since then for his wife and families' forgiveness. He has not shied away from what he did or made any excuses, he has accepted responsibility and shown true remorse.

Mr. David made an extremely terrible decision. But this decision was in sharp contrast to the man described in the almost 60 letters filed by members of his community. These letters show a man who has dedicated himself to bettering his community, who is always willing to take the time to give advice or help a friend in need, and is never too busy to volunteer or spend time with his family. Mr. David's family needs him and the community would be better served if this educated hard-working man was able to continue to dedicate his time to his community and his family instead of spending years incarcerated. Mr. David will never re-offend, he has learned his lesson, albeit the hard way, and he will never again do anything to compromise his family. A sentence of 24 months would serve the interests of 3553 and would arrive at a sentence that serves those goals without being greater than necessary.

**A.   There is no actual or intended loss in this case.**

This case is extremely unique.  Mr. David pled guilty to a loss amount of $13,429,000, a 20-level increase in offense level, because he took that amount which was intended for the Sacramento Kings in the future and diverted it for his own purposes immediately. Jeff has accepted his responsibility, agreed to this plea agreement so he could do so, and by no means minimizes what he did.  Nonetheless, there was **no** loss in this case.

The loss amount is the greater of the actual loss and the intended loss.  U.S.S.G. § 2B1.1, n.3.  But here, there was no actual or intended loss.

*There was no actual loss in this case*.  Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1, n.3.  "A court should measure actual loss by 'how much better off the victim would be but for the defendant's fraud.'" *United States v. Harper, 32 F.3d 1387* (9th Cir. 1994)(*citing United States v. Haddock*, 12 F.3d 950, 961 (10th Cir. 1993)).  ; *see also United States v. Downs*, 123 F.3d 637, 642–44 (7th Cir. 1997) (holding that value of collateral must be deducted from loan amount to determine loss).  In the context of a fraudulent bank loan, courts have explained that to determine actual loss a court should "calculate loan losses by taking the outstanding balance of a loan (at the time the offense is discovered) and subtracting the assets securing the loan (again at the time the offense is discovered)." *United States v. Downs*, 123 F.3d 637

(7th Cir. 1997); *see also United States v. Williams*, 292 F.3d 681 (10th Cir. 2002) (finding "pledged assets recovered by a creditor should be deducted from the calculation of actual loss."). The same principles should apply here.

Here, there was no pecuniary harm to the victims. Mr. David took the money he fraudulently obtained and invested it in two properties in Southern California. PSR at ¶ 14. These assets were valued at the same amount (or more) than the money taken from Golden 1 and Kaiser Permanents. And in fact these properties were subsequently sold by the government (with Mr. David's help), so that the government now has **the full amount** of money that was taken. The PSR specifies that on May 28, 2019 the Sacramento Kings received $13,203,787.90 and the remaining restitution balance will be paid to them after the Court orders the criminal forfeiture. PSR at ¶ 19. There was therefore no actual loss in this case.

*There was no intended loss*. In April 2015 the Guidelines were amended to define intended loss as "the pecuniary harm that 'the defendant purposefully sought to inflict.'" This change was made to reflect the principle that intended loss should "focus more specifically on the defendant's culpability." Amendments to the Guidelines 2015 at 24, § 2B1.1, application note 3(A)(ii). Here, Mr. David did not intend to inflict any loss; in the years when the Sacramento Kings expected the money from Golden 1 Credit Union and Kaiser Permanents to come in, Mr. David intended to wire the money to

the Sacramento Kings. He planned to do this[1].

Mr. David used the $13,429,000 to purchase and then renovate two investment properties in Southern California. His intention was to sell the properties when the Sacramento Kings were expecting to receive money from the two sponsors and to put the money in the Sacramento Kings bank account, so that no one would be the wiser, and to keep the extra profits. Mr. David never co-mingled these funds, or put them in his personal bank accounts or finances, he always kept them in a separate investment account which he used strictly to invest in properties. In his mind, he was borrowing this money, investing it, and then returning to the Kings. His intention does not excuse his behavior by any means and is not a legal excuse or defense. And he does not assert that. However, it does go to intended loss. And here, where he intended to sell the properties (like the government did) and get all of the money back (like the government did), he never intended there to be a loss.

In determining whether to issue a credit for repayment against loss, a sentencing judge examines whether a defendant *intended* for the payment to go back to the victim. For example, in *United States v. McCormack*, 309 F.3d 623 (9th Cir. 2002), the court stated that a sentencing judge "must look into whether a defendant intended to repay" and in cases involving

---

[1] Mr. David's written statement to the Court addresses this issue. In hindsight, looking carefully and with fine detail now it might appear that wiring the monies back might pose some problems, maybe not; nevertheless, it was his honest and genuine plan to pay the money back.

collateral courts "must also consider whether a defendant planned to return the collateral or anticipated that such collateral would be repossessed or foreclosed on by the lending institution." *Id.* at 629; *see also United States v. Lace*, 699 F.3d 710, 720 (2d Cir. 2012) (allowing the sentencing court to draw an inference, where supported by appropriate evidence, that the intended loss in case of a loan secured by real property should include an offset for the value of the property because it would be unlikely for a defendant to "intend the improbable result that real property be destroyed or otherwise rendered valueless."). Here, Mr. David intended to repay the money to the Sacramento Kings. Clearly he had no intention of foreclosing on these properties or having them be repossessed by the bank, he invested substantial amounts of money for home improvements and he also invested *his own money* to purchase these properties. He was not living in them or using them, they were investment properties that he intended to sell. He intended to make a profit and return the original "investment" to the Sacramento Kings to evade discovery. The Court does not have to guess at whether this would have been possible because the government sold the properties, recouped the "investment" amount and is returning that investment to the victims. Thus, the court should credit the repayment amount against the loss in fashioning a non-recommended guideline sentence.

To be clear, Mr. David is not objecting to the loss amount in the plea agreement; he has pled guilty, accepted his responsibility and the loss amount therein. Nevertheless, the court should consider the specific characteristics of this

offense under the 3553(a) factors.  In those case, the specific characteristics are that there was ***no loss***.  Thus, the guidelines here, with a twenty-level increase for loss amount, are severely overstated, and this court should sentence the defendant well below the advisory guideline range.

**B.  Similarly situated Defendants have received probation**

Defendants in similar situations – where there was no actual loss, have been sentenced to probation.

*United States v. Prosperi*, 686 F.3d 32, 37 (1st Cir. 2012) is exactly on point.  In *Prosperi*, the court held the defendants accountable for a 5.2 million loss, even though there was no actual loss to any victim, but found that "it would not allow the loss figure to drive sentencing decision," explaining "I do not believe the estimated loss figure–given the nature of the case–has pivotal significant in fashioning an appropriate sentence." *Id.* at 38-39.  Thus, even those the defendants went to trial, and their advisory guideline range recommended a sentence of 87 months imprisonment, the court imposed sentences of 3 years probation, 6 months home confinement, and 1,000 hours community service.  *Id.* at 40-41. The reasons set forth were because of family circumstances, the fact they repented and, just plainly-- incarceration would not be the best sentence for the defendants or society as a whole. *Id.* at 41.

In this district, in *United States v. Mark Reynolds*, Fresno, 18-CR-0081, in October 2018, in front of United States District Court Judge O'NEILL, Mr. Reynolds was indicted for five money laundering counts and fourteen mail fraud counts.

His fraud occurred over a total of 8 years until discovered. Just before trial a Superseding Information was filed and Reynolds pled to a count with a 5 year maximum, and the money laundering and mail fraud counts were dismissed. ***Importantly, Reynolds paid back all of the embezzled funds prior to sentencing, but after discovery***. This amount was just over $4 million. Like Mr. David, Reynolds had no prior criminal history, was married and a father of young children. In the end, Reynolds received a sentence of straight probation.

This sentence of straight probation occurred just days before this defendant signed his plea agreement with the government.

Similarly, in the Central District of California, in *United States v. White*head, *532 F.3d 991* (9th Cir. 2008), the defendant was charged with stealing over $1 million worth of counterfeit Directive digital satellite feeds. He faced a guideline range of 41-51 months, but the court ultimately sentenced him to probation because he had repented his crime, had devoted himself to an honorable life since his conviction and his eight-year old daughter depended on him. *Id.* at 993. The Ninth Circuit upheld this sentence as reasonable based on these factors. *See id.; see also United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008) (defendant sentenced to three years on supervised released (one-day in jail) where guideline range was 30-37 months and defendant had pled guilty to embezzling $650,000 from non-profit organization over course of three years).

Indeed, courts around the country pre-*Booker* have crafted probationary sentences as variances for first-time, non-violent offenses where it is clear the defendant will not re-offend and can positively contribute to society. *See United States v. One Star*, 9 F.3d 60, 61-62 (8th Cir. 1993) (upholding as reasonable a downward departure to a term of probation where guideline range was 33-41 months); *United States v. Sclamo*, 997 F.2d 970, 972 (1st Cir. 1993) (upholding as reasonable a downward departure to a term of probation where guideline range was 24-30 months).

Post-*Booker* cases occur like *United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) (en banc) (district court did not abuse its discretion in sentencing defendant to probation with a year of home detention, community service, restitution, and fine for tax evasion, rather than to term of imprisonment where guideline range was 12 to 18 months, in part because defendant's negligible criminal history, employment record, community ties, and extensive charitable works); *United States v. Rowan*, 530 F.3d 379 (5th Cir. 2008) (where defendant convicted of possession of child pornography and Guidelines were 46-57 months, sentence of five years supervised release not unreasonable in light of *Gall*); *United States v. Bueno*, 549 F.3d 1176 (8th Cir. 2008) (where defendant possessed more than 70 kilograms of cocaine, and Guidelines were 108-135 months, sentence of probation with house arrest for five years not unreasonable noting that "offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty,'…and as the district

court observed in this case, Bueno is subject to house arrest during the entire five-year period of probation."); *United States v. Coughlin*, 2008 WL 313099 (W.D. Ark. Feb. 1, 2008) (where defendant embezzled money and evaded taxes and Guidelines were 33-41 months, sentence of probation with home detention for 27 months was imposed in part because "home detention and probation can be severe punishments...hugely restrictive of liberty, highly effective in the determent of crime and amply retributive.").

Here, two years imprisonment and a term of home confinement is the appropriate sentence in this case; such a sentence would punish him for his conduct, but not keep him from his family unnecessarily and allow him to instead offer his skills and attributes to the community at large. As the Supreme Court explained in *Gall*, a probationary term is not insignificant -

> custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.... Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.... Most probationers are also subject to individual "special conditions" imposed by the court. Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer.

Gall, 552 U.S. at 48.

## C. He has shown extraordinary acceptance of responsibility and true remorse

Mr. David's character has shown itself through this process, when he was caught he made the right decision immediately; he has shown true remorse. He took full responsibility for his actions with the authorities and then with his family and members of his community.

Within 24 hours of the FBI questioning him, Mr. David flew out to Sacramento, against the advice of counsel, to admit to everything that he had done. He was never interested in denying his involvement or suggesting others were involved. Mr. David immediately put together a box of documents filled with every document associated with the crime. This box contained everything the government needed to make a case against him (articles of incorporation for the LLC he created, copies of the fraudulently revised sponsorship agreements, bank records and real estate purchase agreements, among many other items). Mr. David catalogued all the files and highlighted the documents he thought would be most useful to the government.

Mr. David also tried to make things as "right" as he could as quickly as he could. To that end, he asked to meet with the executives of Golden 1 Credit Union and Kaiser Permanents to apologize for what he did and allow them to ask questions, yell, or whatever they needed. He also wanted to speak with the executives at the Kings, a request which was denied but he was able to speak with their attorney. He told him he would be open to helping the third party investigators understand how he was

able to redirect the money so this would never happen again. Mr. David spoke with them over the phone for 1 hour and agreed to fly to Sacramento for a face to face debriefing at his expense. Mr. David then spent at least two full days with various attorneys like Benjamin Wagner representing Golden One, Courtney Linn, General Counsel for Golden One, William Portanova, representing the Kings, and recently retired federal agents Paul Artley and Steve Delaney. In these meetings, Mr. David went with the investigators meticulously going through documents, answering questions and providing information. He then had follow up phone calls with the investigators in the weeks afterward and spoke with the victims agents without his attorneys involvement freely.

Most importantly, Mr. David worked diligently to return the money and ensured that everyone has been made whole. Mr. David worked with the real estate agent to ensure the properties were sold quickly and for enough money that no funds were ever lost. Mr. David came to the initial meeting with the prosecution with an offer on the home. The offer was rejected by the government for being too low ($9.8M), but he recommended a broker the government used Christa Lyons, who Mr. David then worked with daily to market, price, negotiate and counter offers being made on both properties. He pro-actively signed the sale agreement for one home and helped negotiate the sale on the other when the government refused to counter a low offer. If it was not for Mr. David's involvement and understanding of the real estate negotiating process, the low $10M offer would not have been countered and the sale would have fallen apart. Due to

Mr. David's involvement, the sale went through at a record price per square foot and the victims have all their money returned. Thus, even though the amount of loss in this case is large, there is no outstanding restitution because every penny has already been paid back. This is extraordinary.

Post *Booker* courts have found exceptional circumstances where the defendants have made efforts to repay all money owed and have departed downward. *United States v. DeMonte*, 25 F.3d 343, 346 (6th Cir. 1994) (finding "we have acknowledged that restitutionary payments may constitute 'exceptional circumstances' that justify a downward departure."); *see also United States v. Oligmueller*, 198 F.3d 669, 672 (8th Cir. 1999) (affirming a district court's downward departure on the basis of extraordinary restitution because "[w]e have previously held that cases can fall outside the heartland when there are extraordinary efforts at restitution.").

In *United States v. Kim*, 364 F.3d 1235 (11th Cir. 2004), the payment of $280,000 restitution by defendants after they pled guilty to conspiracy to defraud the U.S. was extraordinary enough to remove case from heartland and justify downward departure from 24 months to probation and home detention where defendants dipped significantly into their life savings and voluntarily undertook enormous amount of debt to pay restitution. The court explained, "[C]ourts have looked to a wide range of factors, such as the degree of voluntariness, the efforts to which a defendant went to make restitution, the percentage of funds restored, the timing of the restitution, and whether the defendant's motive demonstrates sincere remorse

and acceptance of responsibility." *Id.* at 1244.

On a personal level, Mr. David has also shown true remorse. As you will read in the letters, Mr. David drove straight to Ohio to tell his wife's family what he had done and since then has been working for his wife and family's forgiveness. Mr. David has also not hid his actions from members of his community, the letters show how he has not shied away from what he did or make excuses, but has accepted responsibility to every person he talks to. Mr. David has shown true remorse.

Pastor Frank Espergen eloquently wrote about his "whole-hearted belief and understanding that Jeff has taken ownership and responsibility for his conduct, and in every interaction with me done so with remorse and deep sadness, not for getting caught, but for compromising his integrity, his understanding of right and wrong, and the trust others put in him. . . I have rarely seen actual, honest and heartfelt remorse in my careers, first as an attorney (where I acknowledge that our paths have previously crossed) and now as a Lutheran pastor. But that is what I have seen in Jeff David's behavior, and experienced in my interactions with him. . . I am completely convinced that Jeff will use the remainder of his years working to make up for his crime."

His sister-in-law further explained, "whenever I get mad about the harshness of this plea, he always reminds me in a calm voice and tears in his eyes, 'Elizabeth, I appreciate your support, but I did this. We are in this situation because of me." And his father-in-law, Dr. Richard Weber, wrote: "He fully admitted to the criminal and illegal civil acts and

expressed shame and extreme remorse. He was immediately regretful, not merely for his illegal actions but also for all the personal pain he had generated. In our many hours of talking he never once attempted to deny, minimize, or defend his behavior. He blamed no one but himself for his situation and his plight. He was accountable and responsible."

And his friend John Berlinksi explained that when he called Mr. David he expected an excuse, but "what I heard back was far from an excuse: rather, a straightforward admission." His brother-in-law, Aaron Benjamin put it perfectly, "At a time most would crumble or be in denial, Jeff has owned what he has done and works every day to be a productive person to society. Whether through his volunteer efforts coaching or going out of his way to help others tackle projects at their house, Jeff is someone that makes others want to be better. He has consistently demonstrated to me that he has a caring, kind, sensitive heart."

Courts have found super acceptance of responsibility and true remorse a valid reason for a below guidelines sentence, beyond the reduction for acceptance of responsibility in the guidelines. *See United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (where defendant convicted of filing false income tax return, and guidelines 10-16 months, district court properly imposed sentence of probation in part because defendant "cooperated with authorities and accepted responsibility . . . to an extraordinary degree"); *United States v. Brown*, 985 F.2d 478 (9th Cir. 1993) (under § 5k2.0, in light of defendant's confession, court can depart downward

from the range if it determines that the two point reduction did not adequately reflect acceptance); *Smith v. Wainwright*, 664 F.2d 1194, 1196 (11th Cir. 1981) (finding a defendant's acceptance of responsibility "is often a significant first step towards his rehabilitation and, for that reason, deserving of a possible reward in the form of a lessened sentence."); *See United States v. Stall*, 581 F.3d 276 (6th Cir. 2009) (in child porn case where guidelines 57-65 months, court's sentence of 1 day in jail, 10 years supervised release, and one year house arrest, not unreasonable in part because of defendant's "exceptional expression of remorse [at the time of his arrest and thereafter], immediate cooperation with the investigation, commitment to counseling, and demonstrated promise for rehabilitation."); *see United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) (where defendant convicted of mail fraud with loss of $150,000 and guidelines 18-24 months, sentence of probation with 3 months home detention not unreasonable in part because defendant "showed genuine remorse at sentencing" as found by the district court); *United States v. Fagan*, 162 F.3d 1280, 1284-85 (10th Cir. 1998) (because guidelines do not expressly forbid the departure, . . .court may downward depart where defendant showed great remorse "to an exceptional degree" even though the defendant already received adjustment for acceptance of responsibility).

## D. Exceptional good works and family

The almost 60 attached letters in support of Mr. David perfectly encompass Mr. David's dedication to community service and his impact on the lives of those around him. As his friend and colleague Peter Fox wrote "Everywhere he has worked he has left a positive footprint on the community in which he was based." And his friend and colleague Scott Moak wrote "Jeff David is a good human at his core . . . he has a gift and spirit of helping others." These letters reiterate how he could better serve his community through continued community service, rather than by being incarcerated for years.

As the court held in *United States v. Adelson*, 441 F. Supp. 2d 506 (SDNY 2006) after giving a departure from a advisory guideline range of life in prison to 42 months,

> surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at a moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'

*Id.*

Other courts have also considered the good a person has done for their community and the impact incarceration would have on one's family in drastically departing downward to probation. *See United States v. DeShon*, 183 F.3d 888 (8th Cir. 1999) (where defendant pled to tax evasion, district court did not abuse its discretion in departing downward from 30-37

months to 5 months community confinement without work release based on defendant's post-offense rehabilitation, after witnesses testified that he had "renewed his life in the church" and was making extraordinary efforts to turn his life around); *United States v. Bryson*, 163 F.3d 742 (2d Cir. 1998) ("This Court has held that a sentencing judge may exercise discretion and depart from the applicable guideline range in light of a defendant's efforts toward rehabilitation, provided those efforts are extraordinary."); *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (in securities fraud and tax evasion case, with sentence range of 14-21 months, four-level departure for "good works" and sentence of probation was warranted for defendant's "exceptional" good works who did not simply donate money to charity but also organized and ran youth football team in depressed area, mentored its members, and helped several members attend better high schools or go to college, which qualified as exceptional because they entail "hands on personal sacrifices which have a dramatic and positive impact on the lives of others."); *United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000) (community service and charitable works performed by defendant were sufficiently "extraordinary and exceptional" to justify three-level downward departure for community and charitable activities).

Mr. David's commitment to community service and charitable works is extraordinary and exceptional. His interest in serving the community began as a young kid, he volunteered for the Special Olympics and was an active participant in his Church Youth Group, organizing a trip to impoverished villages

in Mexico to build homes and rebuild schools, spending his summer replacing shanties made from mud and old tires into more suitable homes. His community involvement continued in college, where he created an annual Haunted House during Halloween, providing a safe place for the neighborhood families to Trick-or-Treat. This event won Loyola Marymount University's prestigious "Philanthropy of the Year" Award two years in a row.

Early in his professional career, Mr. David spearheaded the philanthropic division for the AVP Professional Beach Volleyball Tour, raising funds and awareness to the environmental challenges taking place near the tournament locations throughout the country working with Heal the Bay, Surfrider Foundation, and supporting the habitats of the local sea life.

As his career grew, so did his philanthropic efforts, Mr. David formalized the community assistance program for the Sacramento Kings to benefit many of the 350 registered non-profits in the Sacramento area. Through event based fund-raising, media campaigns, 50/50 raffles and consultation services, the Kings have since impacted hundreds of the Sacramento community non-profits with millions of dollars. His colleague Scott Moak wrote, "because of his leadership and creativity, Jeff was able to create the framework of several philanthropy programs [at the Kings] that have since resulted in directing hundreds of thousands of dollars to worthwhile nonprofit to help them achieve their vision." Additionally, Mr. David pushed through an initiative within the Kings

organization to have each employee donate 50 hours of their personal time each year to volunteerism, for a grand annual total of 10,000 hours. Not only did Mr. David prioritize the importance of this initiative within the company, but he personally led the company in volunteer hours, contributing well in excess of the 50 requisite volunteer hours. Scott Moak wrote "He set the bar for the C-suite leaders of the company and allowed all of us to see that he was a person who truly cared about helping other people and giving back."  This initiative was so successful that the Kings were recognized by the Sacramento Business Journal for the impact the Community Assist Initiative made on the Sacramento community.

Mr. David also continued his philanthropic efforts personally, he served as the Fund-raising Chair for the American Heart Association, recruiting a team of like-minded corporate citizens, ultimately raising over $1 Million dollars in donations during his time as chair. He also led a charge to rebuild school libraries and otherwise assist Napa schools after the earthquake in 2014. And he worked to build playgrounds at local schools, as well as community recreation centers and assisted in the rebirth of the McKinley Park Playground after it burned down due to arson. Mr. David also participated in Career Camp at Sutterville Preschool, where his daughters attended.

No matter how busy his career got, he always took the time to mentor or help out someone interested in his field.  A former colleague, Chris Morales wrote "To this day, I consider Jeff the most influential person in my career.  For some

reason, Jeff always looked out for me. . . . He's the older brother that I never got to have. He's the guy I could lean on when I had questions about literally anything. He took me under his wing and helped me craft a style that has set me up for success in the business world." He helped to mentor his 15-year old next door neighbor, as Mason's parent's wrote, Mr. David "spent a good amount of time organizing a day with the King's Organization where he arranged for Mason to meet with the Assistant GM and sit in on some meetings. This has stuck with Mason as he gets ready to attend college. We have always seen Jeff as a very generous person with his knowledge and his time." And Mason asked to write a letter about that day, "It was an amazing day and has truly changed my life. Jeff in no way had to plan out this day, but he did because he genuinely cared about me and my future."

Mr. David's younger brother, Jonathan, also writes about how Mr. David paved the way for his professional career, mentoring him and ensuring his success. And Jonathan's best childhood friend also looked up to Mr. David writing "Jeff has always been the most welcoming and generous person to me, a kid without a close father figure or good relationship with his own brother. He doesn't know it but I've looked up to him and what he represents as a brother, man, professional, husband, and father." And Jonathan's wife, Stephanie, "Jeff influenced Jonathan's trajectory from a very young age, taking responsibility to teach Jonathan some of life's most crucial elements: how to pave a path in a career that followed his passions, how he should treat women, and mostly, the importance

of family." Another colleague, Jay Polonsky, wrote "Jeff has always been there when I need advice, a smile or just someone to help me pass the day. He is one of the most inspirational people I know . . . I feel fortunate for the opportunity to share in his climb up the professional ladder of success through his hard work and dedication, yet he always made time to help others. On several occasions, I asked Jeff if he would share his expertise with young family acquaintances interested in the sports marketing business. Without hesitation he made time to spark additional enthusiasm with these potential future members of the work force."

Mr. David has also volunteered as a youth coach for just about every sport his children have played. As his friend Angie O'Brian wrote: "If there is a coach needed to take over for soccer tots, Jeff steps in. If a volunteer is needed at school for Field day, Jeff steps in." He was a youth soccer coach for 4 years in Sacramento and since moving to Ohio he has been a youth soccer coach, basketball coach, and lacrosse coach. He also volunteers at his children's local school, he is a regular reader in the preschool and kindergarten classrooms and assists the elementary school children with reading and writing. He also has continued to volunteer at his church with his family.

The letters show the huge impact Mr. David has had on the children he has coached. The mother of a child on Mr. David's team wrote about the difference he made in her daughter's life: "His spirit of joyful leadership and whole-hearted support of all the children on and off the field was truly something both

my husband and I talk about being so thankful to have been a part of. For those 60 minutes three times a week, he facilitated a lot more than soccer practice. He delighted our children with a chance to feel delighted in, and accepted exactly as they were in that moment. . . We need coaches, teachers, fathers like Jeff." Thomas Dugan, Jeff's co-coach in soccer wrote "Jeff always made it a point to ensure the team's mantra was - play hard, have fun, and demonstrate good sportsmanship. During our time coaching together, it was evident that Jeff tried to bring out the best of his young players, while never losing focus on them having fun and helping them develop their life skills." And his friend and neighbor in Ohio, Courtney Grant, wrote: "Unlike many, Jeff doesn't just do things to "volunteer". Everything he does, with and for his children and others, he does with an immense amount of thought and care. It is evident in all he does that he truly just wants to make a difference in others lives, especially young children. Whether it's the basketball court, the soccer field, a cardboard duct tape challenge at school, Jeff is on his knees one on one at every interaction with little ones. I have seen him drying tears, giving encouragement, helping a child understand - and not just his own children. He truly fosters kids being their best selves and loving themselves and what they do. And he makes it fun, he laughs with the kids and isn't afraid to be silly to get them to smile. He has made such an incredible impact to the confidence and spirit of so many young children in such a short period of time. . . He makes a difference for those around him

just showing he cares and the confidence in knowing Jeff will always be there for you to help shoulder any burden you may be carrying.  In my opinion, there is a very unique gift in Jeff, as a father, a neighbor, a friend you don't see too often."

But Mr. David's character is best described by his former neighbors:

- Neighbors Jim and Jennifer Jeffers: "What struck us the most about Jeff, was his genuine interest in what was going on in other people's lives.  He wasn't the kind to ask how you are doing unless he truly wanted to know."

- Neighbor Megan Fisher wrote that when she was diagnosed with breast cancer Jeff and Kate delivered meals to her home, offered to watch their children and "offered help, compassion and generosity."

- Neighbor Steve Carden, "Jeff and Kate were the glue and hub of our community within the larger neighborhood. . . [they] opened their loving, welcoming home to us all, and that created and fostered the bond we all shared."

- Neighbor Heather Fuller: "The Davids were a valuable part of this community and an extremely close family that was ALL IN when it came to education and athletics. It was a huge loss to our neighborhood when the Davids moved to Miami.  The Davids were known for giving of their precious time and talent whenever and wherever needed."

- Neighbor and babysitter, Ally Jeffers: "Jeff and Kate are some of the most committed and involved parents that I have ever known and they set an example for my little brother and I in everything that they did.  Jeff was

always so generous with his time with his neighbors and his children. . . Jeff is an incredibly loving, generous and compassionate father and neighbor who spent the majority of his time focused on others."

- Neighbor Shannon Dugan: "In addition to their devotion to each other and their children, the Davids made a real commitment to their community, our community, here in Sacramento."

Mr. David's life is his family: his wife and three young children. Because of this, Mr. David is no longer working and his wife had to go back into the workforce after years as a stay at home mother, to make a small percentage of the salary Mr. David was earning. Mr. David has never been away from his 3 young children, he now drives them to and from school each day, volunteers at their school, and coaches all of their sports teams. These children need their father. "His young family needs his huge heart, his warm embracing smile, and his guidance in their lives."

As Mr. David's sister in law, Elizabeth Benjamin, describes: "I've seen his world come crashing down in the past 9 months, but the only thing he cares about is his family and making sure they have the love and support they need." She continues, "He's the dad that wakes up at 4:30am before his kids swim meet to make them "breakfast to go cups" with eggs and sausage with a homemade fruit smoothie that he blends outside so he doesn't wake up his wife. When Kate returned to work he made 'flat Kate' a cut-out of her face he took everywhere to take pictures with her 'face' in the shot so she

could still feel like a part of the kids day and activities."

And his former nanny and babysitter, Rosie Doria, wrote "Jeff is easily one of the best fathers I have seen. He is a man who invests substantial time and energy into improving the lives of his children. He makes certain that his children know they are loved unconditionally . . He supports his children in their own passions by being a coach for almost every athletic endeavor, or sitting in the stands at every play his eldest daughter performs in."

All letters discuss Jeff's hands on involvement as a parent and his creativity in keeping his kids (and other kids_ happy and entertained, he built a tree house, a climbing wall in their basement, and climbing rigs for the trees in their backyard, he sets of sledding courses, attends every swim meet and practice, and makes his children laugh. His children and family need him. *See United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) (upholding downward variance in part because defendant "is a good parent" which is a "valid consideration under § 3553(a)"); *United States v. Sayad*, 589 F. 3d 1110 (10th Cir. 2009) (where defendant convicted of interstate delivery of 11 kilograms of cocaine and guidelines 57 months, sentence of probation is reasonable in part because, unlike in most cases, here strong family support will aid rehabilitation); *United States v. Milikowsky*, 65 F.3d 4, 8 (2d Cir. 1995) ("Among the permissible justification for downward departure . . . is the need, given appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third parties."); *United States v. Husein*, 478 F.3d

318 (6th Cir. 2007) (where defendant convicted of participating in drug transactions, where guidelines 40 months, sentence of one day in prison and 270 days home confinement warranted in part where district judge properly determined that defendant's family would "benefit more by [defendant's] presence than society is going to benefit from [her] incarceration.").

**E. Mr. David will not re-offend**

Mr. David will never re-offend, he has learned his lesson, and he will never again do anything to compromise his family. He has already been publically humiliated and the repercussions to his personal and professional life are never ending. Http://www.whitehouse.gov/news/releases/2007/07/20070702-3.html (where Scooter Libby convicted of perjury and obstruction of justice and receives 30-month guideline sentence, President Bush commutes the prison sentence to 0 months because 30 months "excessive" and because the conviction itself is "harsh punishment" where "the reputation he gained through his years of public service and professional work in the legal community is forever damaged [,] his wife and young children have also suffered immensely, [where] he will remain on probation."; *see also United States v. Adelson*, 441 F. Supp. 2d 506 (SDNY 2006) (in securities fraud case, where guidelines call for life, court imposes 42 months in part because "there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders.)

Mr. David has no criminal history, a factor courts have relied upon in imposing probation or otherwise departing downward. *See United States v. Artery*, 555 F.3d 864 (9th Cir. 2009) (where defendant convicted of possession of pornography and where guidelines 41-51 months, court's sea sponge variance to probation not unreasonable in part because of his positive characteristics "such as his having no history of substance abuse, no interpersonal instability, no sociopathic or criminalistic attitude, his motivation and intelligence, and his support of his wife and child."); *see also United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) (en banc) (where defendant convicted of tax evasion of $255,000, and guidelines 12-18 months, court's sentence to probation on condition of one year home detention and fine of $150,000 not unreasonable in part because of defendant's "minimal criminal record"); *United States v. Ward*, 814 F. Supp. 23 (E.D. Va. 1993) (departure warranted because guidelines fail to consider length of time defendant refrains from commission of first crime, here until age 49); *United States v. Polito*, 215 Fed. Appx. 354, 2007 WL 313463 (5th Cir. Jan. 31, 2007) (where defendant convicted of possession of child pornography and guidelines 27-33 months, district court's sentence of probation with one year house arrest reasonable in part because first offense); United States v. Baker, 502 F.3d 465 (6th Cir. 2007) (where defendant pled guilty and guideline range 27-33 months, below-guideline sentence of probation with one year house arrest proper in part because he behaved "exceedingly well" while under supervision of pretrial services.).

Here a sentence of 24 months would serve the interests of 3553 and would arrive at a sentence that serves those goals without being greater than necessary. As his friend, lawyer John Berlinksi concludes "the world will be better off with Jeff helping to raise his young children, coach their games, support his wonderful wife Kate, and use the platform this high-profile crime has provided him to tell others about the mistakes he has made and convince them to learn from these mistakes."

## CONCLUSION

For the reasons set forth, Mr. David should not be sentenced to any more incarceration than the two-year mandatory minimum required, and a term of release on electronic monitoring for house arrest, an appropriate amount of hours of community service, along with whatever appropriate terms of probation the Court determines. Mr. David will not re-offend, he has shown true remorse, extraordinary acceptance of responsibility, the victims have been made whole, and Mr. David always intended to make them whole. This community and his family will be better served with Mr. David working on the outside to make his community better.

Dated: June 10, 2019

Respectfully submitted,

ATTORNEYS FOR DEFENDANT:

*Mark J. Reichel*
MARK J. REICHEL


*Marc David Seitles*
MARC DAVID SEITLES, ESQ.
SEITLES & LITWIN


*Ashley Litwin*
ASHLEY LITWIN, ESQ.
SEITLES & LITWIN