UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
--oOo--

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Docket No. 18-CR-253 |
| | ) | Sacramento, California |
| Plaintiff, | ) | June 24, 2019 |
| | ) | 9:00 a.m. |
| v. | ) | |
| | ) | |
| JEFFREY R. DAVID, | ) | Re: Judgment and sentence |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM B. SHUBB
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        HON. McGREGOR W. SCOTT
                          United States Attorney by
                          MR. MATTHEW YELOVICH
                          MR. KEVIN CHRISTOPHER KHASIGIAN
                          MR. MICHAEL DWIGHT ANDERSON
                          Assistant U.S. Attorneys
                          501 I Street, Suite 10-100
                          Sacramento, CA 95814

For the Defendant:        REICHEL & PLESSER, LLP by
                          MR. MARK JOSEPH REICHEL
                          455 Capitol Mall, Suite 802
                          Sacramento, CA 95814

                          SEITLES & LITWIN, PA by
                          MR. MARC D. SEITLES (pro hac vice)
                          MS. ASHLEY M. LITWIN (pro hac vice)
                          40 NW 3rd Street, PH-1
                          Miami, FL 33128

JENNIFER COULTHARD, RMR, CRR
Official Court Reporter
501 I Street, Suite 4-200
Sacramento, CA 95814
jenrmrcrr2@gmail.com
(312)617-9858

mechanical steno - computer-aided transcription

1          SACRAMENTO, CALIFORNIA, MONDAY, JUNE 24, 2019

2                              --o0o--

3        (In open court.)

4          THE CLERK:  Item 1, Criminal 18-253, the United States

5    v. Jeffrey R. David.

6          Counsel, your appearances.

7          MR. YELOVICH:  Good morning, Your Honor; Matthew

8    Yelovich, Kevin Khasigian and Michael Anderson for the United

9    States.

10         MR. REICHEL:  Good morning, Your Honor; Mark Reichel

11   with my client, Mr. Jeff David.

12         Also at the podium, Mr. Marc Seitles from Miami and

13   Ashley Litwin also from Miami.  Both are now admitted to

14   practice in the Eastern District.

15         For the Court's information, Mr. Seitles used to clerk

16   for Judge Karlton back in 2000, so he and I are friends from

17   18, 19 years ago.

18         THE COURT:  What roles are Mr. Seitles and Ms. Litwin

19   going to play in this proceeding?

20         MR. REICHEL:  Thank you, Your Honor.  I'm going to

21   address the formal objections and then with our request for a

22   nonguidelines sentence I think Ms. Litwin is going to discuss

23   some of the letters that came in and the family members and

24   Mr. Seitles is going to address some of the facts supporting

25   the departure.  We're requesting for the immediate cooperation

1    and assistance and so forth.

2              I also have some kind of eye witness facts I'd like to

3    talk about on that.  But I think when it comes to a request for

4    A nonguidelines sentence it's going to be myself and

5    Mr. Seitles, and we're not going to tag team or anything, but I

6    think at some point he may have something to say, and then I'll

7    stop, if that's acceptable to the Court.

8              THE COURT:  Mr. Yelovich, are you going to be speaking

9    on behalf of the United States?

10             MR. YELOVICH:  Yes, Your Honor.

11             THE COURT:  All right.  I'm not sure there's going to

12   be much discussion about the guidelines.  The Court has

13   received the final presentence report in this matter.

14             Mr. Reichel, you've received a copy of that report?

15             MR. REICHEL:  Yes, we have, Your Honor, and we've

16   reviewed it extensively with Mr. David.

17             THE COURT:  Mr. David, have you received a copy of

18   this report as well?

19             MR. DAVID:  Yes, I have, Your Honor.

20             THE COURT:  And have you discussed it fully with your

21   attorneys?

22             MR. DAVID:  Yes, I have.

23             THE COURT:  The government has received a copy of the

24   report?

25             MR. YELOVICH:  Yes, Your Honor.

1      THE COURT:  With regard to the sentencing guidelines,

2  the Court has received and considered the memoranda from both

3  the United States and the defendant.

4      I will say that while the Court concurs with the

5  probation officer's analysis in this matter, in as much as it

6  was part of the plea agreement, the Court is inclined to adopt

7  the findings with respect to the sentencing guidelines set

8  forth in each of your sentencing memoranda, which would mean

9  that the applicable offense level is 28 and the criminal

10  history category is 1.  Any objection?

11      MR. YELOVICH:  No objection from the government, Your

12  Honor.

13      MR. REICHEL:  No objection, Your Honor.

14      THE COURT:  Very well.  Then for the reasons stated,

15  the Court finds that the applicable offense level is 28 and the

16  criminal history category is 1 in this matter.

17      Now, I would like to address all of the other

18  sentencing factors and anything else that counsel have to say.

19  I'd like to start with the government.  I have several

20  questions with regard to the information in the presentence

21  report that have yet been unanswered for me.

22      Can you tell me how this violation was discovered?

23      MR. YELOVICH:  Yes, Your Honor.  An employee of the

24  victim company where the defendant used to work was going

25  through Mr. David's digital files that he had left behind.  He

1   was no longer an employee of the Sacramento Kings at the time,

2   he had moved on to the Miami Heat, and this employee at the

3   Kings, in going through his digital files that had been left

4   behind, was looking for something else and stumbled upon a

5   folder that's described in the plea agreement factual basis as

6   a folder with the title "Turbo Tax."

7          THE COURT:  Well, that's in paragraph 17 of the

8   presentence report.  I didn't understand that to be something

9   that would have caused the crime to be discovered.  Can you

10  elaborate on that?

11         MR. YELOVICH:  Your Honor, paragraph 17 describes the

12  consensual call that occurred with an employee at the Kings and

13  Mr. David after the investigation had already progressed, but

14  the initial discovery occurred when an employee of the Kings,

15  going through routine checks of digital files looking for

16  something else, stumbled upon this folder.  And the contents of

17  the folder had a series of LLCs that this employee did not --

18  or series of documents about an LLC that this employee did not

19  recognize.

20         THE COURT:  Was that X, Y or Z?

21         MR. YELOVICH:  Part of what was in the folder was

22  documentation of Mr. David's fraud on X, Y and Z, yes.

23         THE COURT:  And then what else was the other company

24  that you just mentioned?  You said an LLC that he was not

25  familiar with?

1        MR. YELOVICH:  Sacramento Sports Partners is the

2   LLC --

3        THE COURT:  Oh.

4        MR. YELOVICH:  -- that the defendant had created.  And

5   so this employee saw paperwork in that folder for Sacramento

6   Sports Partners --

7        THE COURT:  I see.

8        MR. YELOVICH:  -- and that raised questions.

9        THE COURT:  And then what happened?  Did he turn it

10  over to the FBI or what?

11       MR. YELOVICH:  The Kings moved swiftly to begin an

12  internal investigation and contacted the FBI in order to start

13  a federal investigation as well.

14       THE COURT:  I see.  Now, was that before or after this

15  incident that you've just referred to in paragraph 17?

16       MR. YELOVICH:  Before, Your Honor.  Paragraph 17

17  describes a call that occurred toward the end of a very quick,

18  thorough but fast-moving federal investigation.

19       THE COURT:  So this was a setup call after the FBI got

20  into the --

21       MR. YELOVICH:  That's correct, Your Honor.

22       THE COURT:  -- into the case?

23       All right.  What were these properties used for, the

24  two properties in Southern California?

25       MR. YELOVICH:  It's our understanding that they

1    were -- they were used by the defendant as -- they were going

2    to be investment properties.  And we don't have a ton of

3    investigative facts developed on the use of the properties

4    other than the defendant and others visited the properties from

5    time to time and invested in rehabbing the properties.

6          THE COURT:  What type of properties were they?

7          MR. YELOVICH:  They were luxury beach -- they were

8    luxury beach residential properties.

9          THE COURT:  Not -- were they rental properties?

10         MR. YELOVICH:  They could have been rental properties,

11   if that was what the owner chose to use them for.

12         THE COURT:  All right.  Do we know whether they were

13   used for rental purposes during the time that he held them?

14         MR. YELOVICH:  I believe we do know that, Your Honor,

15   and they were used as rental properties, yes.

16         THE COURT:  Did he also use them for his own benefit?

17         MR. YELOVICH:  For his own benefit as in to use them

18   as a vacation home?

19         THE COURT:  Or to live in part-time or anything else.

20         MR. YELOVICH:  I don't have any information that he

21   lived in them part-time.  I do understand that he visited the

22   properties from time to time with family and friends.

23         THE COURT:  To stay in them?

24         MR. YELOVICH:  I believe the defendant has stayed in

25   them, yes.

1          THE COURT:  All right.  How long did he hold them?

2          MR. YELOVICH:  Purchased them in the summer of 2016

3    and the civil forfeiture action started in August of 2018.

4          THE COURT:  All right.  Is there any indication as to

5    how many other people knew that he owned the properties?

6          MR. YELOVICH:  Beyond the defendant?

7          THE COURT:  Yes.

8          MR. YELOVICH:  There are people who were involved in

9    the residential real estate transactions who would have had no

10   reason to suspect anything about the nature of those

11   transactions.  For example, to purchase the properties,

12   Mr. David had to employ real estate agents and also, as shown

13   in the bank records, was spending money on investing in the

14   properties as well.  So people would have known that he owned

15   the properties through those efforts, but there's no

16   information in the PSR or the factual basis about other people

17   being aware of his purchase at the time.

18         THE COURT:  How about his family?

19         MR. YELOVICH:  Your Honor, Mr. David's wife knew that

20   he purchased these properties, but not the circumstances by

21   which he came into the money.

22         THE COURT:  Well, naturally the question occurs how

23   his wife or others who knew that he was purchasing or had

24   purchased these properties thought he was going to be able to

25   afford a multimillion dollar investment on the salary that he

1    was making from the Kings.

2         MR. YELOVICH:  Well, it's our understanding that

3    Mr. David held himself out as being a very good saver and

4    investor and his salary, while not substantial enough to

5    purchase these properties in cash, was certainly a substantial

6    salary by which he could have accrued some amount of money to

7    secure financing for.

8         THE COURT:  Well, as I understand, his salary was

9    $30,000 a month, roughly, correct?

10        MR. YELOVICH:  I think that's correct.  There, I

11   believe, was an upside annual bonus as well.

12        THE COURT:  Do you know what that was proportionally

13   to his salary?

14        MR. YELOVICH:  If I could have a moment, Your Honor.

15        I don't have the information as to what his annual

16   bonus was.  Defense counsel may be able to shed light on that

17   question.

18        THE COURT:  Well, the question would occur how someone

19   with that income, regardless of what type of a saver he was,

20   he's going to be able to afford $13 million in real estate

21   investments.

22        MR. YELOVICH:  Well, Your Honor, that's part of the --

23   part of the conduct here is that Mr. David used this LLC to

24   hold himself out as someone who was getting investments in

25   order to invest in real estate.  The LLC documents where

1    Mr. David forged the signatures of the president of Golden One

2    and an executive at Kaiser were LLC documents that purported to

3    show that those individuals on behalf of those entities were

4    investing with Mr. David in order to invest in residential real

5    estate.  And so it wasn't just that Mr. David was suddenly --

6    came into all of this cash that would have raised a bunch of

7    suspicions.  He was investing on behalf of an LLC that had

8    different members whose signatures he had forged.

9            THE COURT:  Uh-huh.  I think I understand the Golden

10   One deal, but I really don't have enough information to

11   understand the Kaiser deal.  As I understand it, they were to

12   make sponsorship payments over a period of ten years, but I

13   don't think the PSR tells me what those payments were or what

14   the schedule was.  Do you have any more information on that?

15           MR. YELOVICH:  I do, Your Honor.  In the factual basis

16   to the plea agreement, which was filed at Docket No. 4, the

17   description of the original agreement with Kaiser is listed at

18   A4 of the plea agreement.  And --

19           THE COURT:  I thought I read that.  Can you elaborate

20   on it for me?  I thought I read the plea agreement.  I don't

21   think I saw this information.

22           MR. YELOVICH:  Yes, Your Honor.  Company C is Kaiser.

23   So if we go back to A3, that first paragraph lists sponsorship

24   payments of 2.8 million dollars per year for 10 years.

25           THE COURT:  Oh, okay.  2.8 million for 10 years.

1          MR. YELOVICH:  And the agreement contemplated an

2     unspecified inflation amount that those payments would rise

3     over time.  And in lieu of that inflation mechanism, the

4     defendant negotiated this updated agreement that allowed Kaiser

5     to make an advanced payments of $4.4 million in order to avoid

6     the uncertainty of the inflation.

7          THE COURT:  All right.  So the original agreement

8     contemplated that there would be adjustments in the 2.8 million

9     as time went on.  The so-called amendment to the agreement

10    simply put all the inflationary considerations upfront for a

11    lump sum of 4.4 million and the payments remained at

12    2.8 million over the 10-year period?

13         MR. YELOVICH:  That's correct, Your Honor.

14         THE COURT:  All right.  So the question there would be

15    whether that was money that should be returned to Kaiser or to

16    the Kings, right?

17         MR. YELOVICH:  My understanding is that the Kings are

18    the sole victim and that the other victims described in the

19    factual basis have been made whole by the Kings.

20         THE COURT:  Okay.  I think those are all the questions

21    that I have right now.

22         What else would you like to say on behalf of the

23    government?

24         MR. YELOVICH:  Just briefly, Your Honor, the

25    government recommends a sentence of 102 months of imprisonment.

1    That is primarily for purposes of deterrence and also promoting

2    respect for the law.

3              As outlined in the government's sentencing memorandum,

4    this was a substantial and sophisticated fraud scheme that

5    requires a substantial jail term in order to be consistent with

6    those legislative purposes outlined in 3553 and the 24-month

7    sentence that the defense is suggesting is just not a serious

8    proposal to adequately deter others who might be tempted to

9    pull off something of this size and nature.

10             THE COURT:  All right.  I don't know who to address on

11   behalf of the defendant now, so I will leave it to you counsel

12   to decide who to speak first.  And if I ask a question and

13   whichever one of you thinks is the appropriate person to answer

14   may do so.

15             MR. REICHEL:  Thank you, Your Honor.  I wanted to

16   address a couple of things, questions the Court had of the

17   government.  We sat for an extensive debriefing session with

18   them and they made reports of those interviews and they didn't

19   doubt Mr. David's veracity.  And in those meetings, by the way,

20   we explained --

21             THE COURT:  I don't -- I don't know the government

22   agrees with you that they did not doubt his veracity because in

23   their sentencing memorandum they questioned his veracity.

24             MR. REICHEL:  Well, for the questions the Court just

25   had, we do have an answer for, which I don't think the

1    government disputes.

2        First of all, Mr. David never resided this these

3    properties, in these two properties.  Additionally, he did

4    visit them a few times.  There were a few times that he had his

5    family, but primarily the visits were for rehabilitation and

6    working on the property.  There was only one time that any

7    rental agreement was executed for one of the properties.  That

8    was shortly before June of 2018, and that was for a six-month

9    lease.

10       THE COURT:  So what was -- this was a period of a

11   couple of years at least.  What was -- what was happening with

12   those properties during that period of time?  Did they just sit

13   idle?

14       MR. REICHEL:  They sat idle, Your Honor, and except

15   for he did do improvements to them, Your Honor.  He did make

16   improvements with his own funds and so forth.  So there was

17   only one time that it was rented.  The tenant never moved in.

18   The tenant gave a $51,000 deposit and shortly thereafter,

19   before moving in, a lis pendens was filed by the government.

20   And as things developed -- well, the government filed a

21   lis pendens, and that was August 28th, I believe, or 26th of

22   2018.  And shortly thereafter, Mr. David had to get his funds

23   unfrozen by the government because all of his funds were

24   obviously frozen, as they always are in these cases, and he

25   refunded $51,000 to that tenant.  That's the only time there

1    was a tenant there.  There was an agreement for a tenancy, but

2    there was never a tenant in either one.  They did sit idle and

3    except for when Mr. David really did rehab there.

4         Additionally, the Court wanted to know how anybody in

5    his family could think that Mr. David could afford something

6    like this.  So I want the Court to understand, we have to go

7    back just a little bit, maybe two years before this.  Mr. David

8    was considering investing in real estate with other

9    individuals.  In fact, they would either come to his home or

10   other places and talk about purchasing investment property with

11   what money he could obtain on his own, including looking at

12   Lake Tahoe and some other areas.  I believe we even gave the

13   name of those individuals to the government.  So his wife and

14   his family believed that Mr. David was involved in a group of

15   individuals that were going to invest in real estate.

16        Later on when these funds come to him, he's not

17   involved with those others at all, but it does make his wife --

18   in fact, he tells his wife, yes, the investment with these

19   gentlemen and so forth is now taking place and we work together

20   as a group buying these different homes.  Just so the Court

21   understands that's why he was able to do this without relatives

22   or anyone else saying, "Well, we know what Jeff makes, how

23   could he do this?"  I don't think that's disputed.  And

24   Mr. David is here to tell you that is how it happened.

25        THE COURT:  All right.

1          MR. REICHEL:  Thank you, Your Honor.

2          Also, we're going to have to talk about the fine,

3    which is one of our objections.  There's a $50,000 fine

4    recommended.  And I think part of that calculous that the

5    probation department does is because there's an account that

6    shows almost $400,000 in Mr. David's name that has been frozen

7    since the date of the lis pendens.

8          In that account, of that 400,000, I think it's about

9    200,000 is spoken for, for restitution, final restitution in

10   this case.  But the balance is in there, and I think it's part

11   of the forfeiture agreement.  Mr. Khasigian can maybe talk

12   about that.  It may not be.  But if that's not coming back to

13   Mr. David, and it's not clear from the plea agreement at all

14   whether that comes back to Mr. David or whether that's going to

15   the Kings, but I think that's part of the calculous on finding

16   a $50,000 fine.  So if that's not coming back, Your Honor, then

17   we think the $50,000 fine is not appropriate, in light of the

18   fact of a lengthy prison sentence --

19         THE COURT:  What's your theory as to why at least some

20   of it wouldn't come back?  There's $200,000 left of

21   restitution, as you've indicated.  If there's 400,000 there,

22   what's your theory as to why some of it wouldn't come back?

23         MR. REICHEL:  Because the -- well, we looked at it

24   over the weekend and the language in the plea agreement says

25   that it's subject to forfeiture.

1          THE COURT:  All right.  Well, we can ask the

2     government about that later.

3          MR. REICHEL:  Thank you very much, Your Honor, for

4     letting me address that.

5          We are prepared, then, to begin -- I would -- I can

6     give the Court some information.  Mr. Seitles can also tell

7     about how the case came and the initial -- the initial

8     involvement, which we think is very relevant.

9          MR. SEITLES:  Thank you, Your Honor.  I'd just like to

10    address some of the 3553 factors.  The government has obviously

11    discussed deterrence, but certainly the Court can consider

12    other things in determining what the appropriate sentence is.

13         Your Honor, my involvement in this case came very

14    early.  Mr. David came to my office and indicated the FBI had

15    seen him.  He confessed to his crime immediately to me, told me

16    what he had done, lots of tears at the time.  And I had advised

17    him that the case was out of -- not out of Miami but out of

18    Sacramento, which is when I contacted Mr. Reichel.

19         We contacted the government and told the government

20    that Mr. David wanted to cooperate immediately.  I told

21    Mr. David that he had the right under the law to wait to see if

22    he was going to actually be arrested for this crime, to receive

23    the government's evidence, to evaluate that evidence, to set

24    forth defenses if he had them and to really evaluate what he

25    was going to do.  He did not want to do that.  He elected

1    immediately to, as they say, fall on the sword.  He wanted to

2    amend for what he had done.  He wanted to tell the government

3    what exactly -- how he committed the fraud.  He wanted to tell

4    the Sacramento Kings what he had done.

5         And I said Jeff, I don't know.  I just met you.

6    Within a few hours you're asking me to call prosecutors that

7    I've never met before in another district that I haven't been

8    in, in 20 years; that you want to confess to a crime where

9    there's not even charges against you.

10        And he said, "I don't care.  I'm instructing you to do

11   it," which I spoke to both prosecutors and they said, "Okay.

12   If that's what you want to do, get on a plane and be in our

13   offices at 10:00 a.m. the next morning."

14        And I said, "That's crazy.  How am I going to do this?

15   I will be committing malpractice.  I've been doing this for 21

16   years.  I've never done this before."

17        And the government said, "If this is what Jeff David

18   wants to do, we are inclined to listen to him and not

19   immediately indict him."

20        So that's what we did.  A guy that I had just met

21   literally an hour before, we purchased tickets, we traveled to

22   San Francisco and we drove for the next hour and a half for a

23   guy I just met that admitted to committing a $13.5 million

24   dollar fraud.

25        So when we arrived or as we were arriving, the tears

1    were streaming when he's talking about his children, his three

2    young children, his wife and his family and that he had caused

3    this destruction and he knew it.

4            THE COURT:  Counsel, we're probably going to be

5    involved in this discussion in a little while, and I don't

6    think there's any reason for Mr. David to be standing up here.

7            MR. SEITLES:  Okay.

8            THE COURT:  If you want to have him sit down while we

9    talk about this --

10           MR. SEITLES:  Yes, Your Honor.

11           THE COURT:  -- he may be seated.

12           MR. SEITLES:  Thank you, Your Honor.  Sorry for that.

13           So we arrived in -- again, it was a very comfortable

14   setting, I'll be candid with the Court, when you're sitting

15   next to a person that you don't really know, driving and

16   hearing about their family, the destruction they he had caused.

17   He couldn't give me an explanation as to why he did what he

18   did.  I couldn't figure out why he did what he did.  He's an

19   educated man.  He was working in a successful job, was

20   obviously well respected, and he could not explain, and still

21   to this day, really, why he did what he did.  And all he kept

22   saying to me was, "I need to make amends.  I can fix this.  I

23   can get the Kings back their money.  I will do everything in my

24   power, everything in my power."  And this extreme remorse that

25   he was expressing was unusual to me.  I have to be candid.

1    That is not the type of remorse when somebody's not sitting in

2    a jail cell or facing an actual indictment knowing that they're

3    going to go to prison that you normally would hear.  And that's

4    why it is extraordinary, Your Honor.  I don't sit back and use

5    the word "extraordinary" or "extreme" lightly.  I take those

6    words very very seriously.

7            So when we met with the government, they asked him,

8    obviously, lots of questions over a period of time.  And the

9    one thing we can all agree on is, from the beginning, he

10   admitted what he did.  There was never a doubt.  He didn't try

11   to cast blame on anybody else.  He didn't try to involve others

12   to say "Somebody else's made me do it."  He admitted what he

13   had done.

14           After that lengthy meeting, he went back to Miami.

15   The government allowed that.  They advised us that they were

16   not going to charge him at that time and they would allow him

17   to participate in the sale of the residences in Southern

18   California.  And so we're clear, in his mind, and I think it's

19   important that Your Honor understands what was going on, in

20   Jeff David's mind is he purchased those properties in his mind

21   that they were investment properties.  He used those homes to

22   rehabilitate them.  He added money to them, he bought furniture

23   for them, and he was trying to add value to try to sell them

24   and, in his mind, return the money and take the profits from

25   the sale of those homes.

1          Now, how do we know what was really in Jeff David's

2     mind?  And I would submit just the facts.  We know that Jeff

3     David provided $250,000 of his own money into Sacramento -- the

4     Sacramento account that he had created, $250,000 of his own

5     money because, in his twisted head, he believed that this was

6     money that was being all invested, his money and the Kings'

7     money, into these properties.

8          So the reason why the government is not standing up

9     and saying he went and purchased millions of dollars of cars

10    and jewelry and luxury travel is because that's not what he

11    did.  And that's what makes this case so odd and so

12    extraordinary is because of the fact that he didn't do those

13    things.  There was, in his mind, putting in his own money, a

14    strange and certainly illegal way of commingling these funds.

15    And he explained this to the government.

16         When he got back to Miami, Your Honor, he went and

17    then provided document after document, literally bankers boxes

18    worth of evidence that was against himself.  They included the

19    loan documents, fraudulent signatures, bank records, other

20    agreements that he had.  He provided -- it was -- it was a

21    plastic bin that we then sent to the government.  He understood

22    what that meant.  They were permitted to use those documents

23    against him.  They were permitted to build their case against

24    him.  But this is what he elected to do, upon his

25    self-reflection, as one letter described it, as a moral and

1    civil metamorphosis.  And that's really what it was.  He knew

2    he had done a horrible thing and a judgment so different than

3    the man he has been for the past 40 years, as the letters have

4    indicated.  So he said, "Marc, give the bin to the government.

5    Let them have it."  But that's not where it ended.

6         Mr. Reichel then contacted the Sacramento Kings and

7    Golden One and Mr. David agreed to fly on his own dime back to

8    California.  Again, the government was very clear, "We're not

9    telling you to do this.  This is not any obligation.  We are

10   not directing this."

11        He said, "I don't care.  I don't care that I don't get

12   a benefit for it.  I don't care the government's not going to

13   file a 5K1 for it.  I'm going to do this because it's right,

14   because I know what I did was wrong."

15        And he flew back up and he met with the investigators

16   from the Sacramento Kings and he met with the attorneys from

17   Golden One and he talked about how he did what he did and,

18   quite candidly, it was embarrassing for the Kings and for

19   Golden One.  And he told them, "Listen, this is nobody else's

20   fault than mine.  I don't blame anyone.  This wasn't anybody's

21   negligence.  This was my fault, Jeff David's fault, and I

22   accept blame, and I'm humiliated by what I've done, but nobody

23   else is to blame but me."  That's genuine remorse.  That's a

24   person that really takes responsibility.  That's extreme

25   remorse.

1    So he sat with the Kings for hours and hours and with

2    the attorneys as well and explained detail by detail how this

3    occurred.  And they had lots of questions.  This was not a

4    30-minute interview or 30-minute conversation.  They spent time

5    because they wanted to make sure this could never, ever happen

6    again.

7    So in the badness of it all, so to speak, there was a

8    shining light, and that's because of what Jeff David did to

9    right the wrong that he had done.  And I plead with the Court

10   to consider this fact and, critically, I would argue, the most

11   important fact, which is at that point Mr. David, with the

12   permission of the government, worked with a realtor that he

13   knew could get the most value for those homes.  There was a

14   low-ball offer because people had seen that there was a

15   government lien, that the government wasn't going to accept.

16   And Jeff said, "Let me do my thing.  Let me get these

17   properties sold so everybody gets their money back," and that

18   is what he did.  He responded with counteroffers, he responded

19   to the actually the ultimately buyer who said, "You know, what,

20   let me wait.  The government's going to seek foreclosure on

21   this property.  That's when I'm going to get a deal.  The

22   marshals are going to sell the property, I'm going to get this

23   for pennies on the dollar," because that's normally how it

24   would work.

25   And David convinced them, "No.  This will be tied up

1    in litigation for years.  You'll get a decent deal but do not

2    let it go into foreclosure.  You're going to get a great deal.

3    The property is going to rise."

4         He, working with a very good realtor, persuaded that

5    buyer -- both buyers, I should say, and ultimately ended up

6    getting a significant value for those homes and to ensure in

7    his mind, to ensure that nobody lost a dollar.

8         THE COURT:  Of course it was in his best interest to

9    get as much as he could from the sale of those homes because he

10   knew that he was going to have to make restitution for the

11   loss, and he probably also thought that if there was anything

12   left over after he made that restitution, that he'd probably

13   get it.

14        MR. SEITLES:  Well, let me answer the first question.

15   The first question is -- you are right.  He ultimately

16   understood because of the lien placed by the government in the

17   civil forfeiture action there was going to be a restitution

18   judgment, absolutely.

19        But I can tell you, after many, many conversations

20   with Mr. David, he did not want to seek a dollar in profit.  He

21   knew what he had done was wrong, so --

22        THE COURT:  Well, Mr. Reichel just a minute ago asked

23   the Court not to impose a fine because he said there was

24   probably going to be some money left over after restitution was

25   made.

1          MR. REICHEL:  I just spoke to the government,

2    Mr. Khasigian, by the way, and he said that money is not coming

3    back to Mr. David at all.

4          THE COURT:  All right.  Well, you thought just five

5    minutes ago that it might, so there's at least an inference

6    there that Mr. David might have thought that it would.

7          MR. REICHEL:  Your Honor, what I meant was where it

8    was accounted for because, actually, Mr. David wanted to donate

9    it to a charitable cause.  So he wanted to say the Kings could

10   use it or someone else could use it.  I just wanted to make

11   sure it wasn't accounted to him for the purposes of a fine.

12         THE COURT:  All right.

13         MR. SEITLES:  Your Honor, we cited, obviously, a

14   multitude of cases supporting variances where restitution is

15   paid in full.  What makes this case even more unique is I could

16   not find a single case where restitution was covered before

17   there was even an indictment in this case.  The indictment

18   was --

19         THE COURT:  Well, it would be one thing -- it would be

20   nice for you if he had made these revelations and expressed his

21   remorse before he got caught instead of waiting until

22   afterwards.

23         MR. SEITLES:  Of course, Your Honor.  Your Honor is

24   absolutely right.  If Mr. David had done that, this would be an

25   entirely different case.  It may not even be a case, to be

1    perfectly candid with Your Honor.

2         The reason why we're here today is -- correct, because

3    he got caught.  But the question under 3553 is not only that

4    you got caught for committing a crime and the nature of that

5    crime, but also the defendant and all of those characteristics

6    under 3553(a), including reoffending.

7         I mean, 60 people wrote letters, many of -- beyond the

8    60 are no longer friends with Mr. David, have abandoned

9    Mr. David.

10        Your Honor, I'd ask the Court not to discount the

11   public humiliation that normally does not occur in the average

12   federal sentencing hearing where somebody is charged with

13   fraud.  It's not all over the news.  It's not -- he's not a

14   public figure having worked for the NBA.  He is humiliated

15   among his peers.  He is humiliated among his friends.  He is

16   ostracized in his community.

17        So we have to take into account when determining what

18   the appropriate sentence is because his -- what he's going to

19   endure and he should endure is far greater.  And what has he

20   done?  Has he shied away from it?  Has he run?  Has he cowed?

21   Did he say, "I want to challenge the government's evidence"?

22   No.  He did the opposite.  He ensured that every single dollar

23   went back to the victims so there was no victim anymore.

24        So to say, as the government did -- to ask for a

25   low-end sentence when in another sentencing hearing you would

1   have victims testifying that they've lost their savings, that

2   they've lost everything and they'd be at the same guideline

3   range as here, the victims who gave statements that all of the

4   money has been repaid.  We've lost nothing.  We are humiliated.

5   We are upset at Mr. David, but you know what, we all got our

6   money back.

7          And respectfully, Your Honor, I don't think the

8   government has cited to a single case to support a guideline

9   sentence in that situation.

10          What has happened here is extraordinary, Your Honor is

11   right.  He got caught.  Absolutely.  There's no running from

12   that.  And that is why we're here.  That is why there is the

13   two-year minimum mandatory sentence.  That is why we accepted

14   the aggravated identity theft charge.  But anything more

15   amounts to retribution, amounts to vengefulness, to being

16   punitive, and that's not what a sentencing hearing is supposed

17   to be about.

18          THE COURT:  Sentencing hearings are punitive.  There's

19   no question about it.  That's what one of the factors in the

20   sentencing guidelines and one of the factors in Section

21   3553(a).

22          MR. SEITLES:  Agreed, Your Honor, it is a factor.  But

23   my point was, it's not the only factor.  And because there's so

24   many exceptional circumstances surrounding this case that the

25   two years is more than sufficient, more than warranted, because

1   of everything that he has done.

2          And quite candidly, Your Honor, I could not find

3   another case in my research where somebody had paid back

4   restitution prior to an indictment.

5          Your Honor's response was, well, he got caught.  That

6   being said, I still haven't found any cases anywhere throughout

7   the United States where that scenario occurred.  And what I

8   have done is all of us have cited to cases where there's been

9   significant variances that have been given where restitution

10  has been paid in full.

11         On that note, Your Honor, I will defer to Ms. Litwin

12  and Mr. Reichel.  Thank you for your time, Your Honor.

13         THE COURT:  All right.  Thank you.  Who's going next?

14         MR. REICHEL:  Your Honor, just briefly.  Mr. Seitles I

15  think covered all of it, but the Court is aware that -- just so

16  the Court is aware that once Mr. David got involved with

17  Mr. Seitles, he also immediately thereafter did everything he

18  can with the government, and I have all of the emails, to sell

19  this property as fast as he could.  And also, he had to come up

20  with his own money to pay off liens and heating and air and so

21  forth.  And like I said, he had to get $51,000 together to give

22  to the prior renter.

23         And I just want to hit on something the Court brought

24  up at the very end was the purposes of sentencing.  And I do

25  not disagree that punishment is one of them, but when we look

1   at sentencing and we look down the road after we've sentenced

2   someone, I always feel that if we give someone a long or

3   lengthy sentence, we don't really know what's going to happen

4   after the first couple of years.

5        And there's this new theory and new philosophy in

6   sentencing that's called "second look." It gets a lot of play

7   in the scientific literature.  And it says you sentence

8   somebody to 10 years or something and you pull them out after 5

9   years and you look at the reasons behind the sentence.  Is the

10  person now rehabilitated?  Have we prevented society from any

11  further crimes by this individual?  Are they a likelihood to

12  reoffend?  Have they programmed well in the prison?

13       If they have, everything thereafter, we believe, may

14  just be revenge, may be punishment that doesn't serve a purpose

15  other than just pure punishment.

16       I think in this case everyone I believe agrees,

17  especially all of the letters that this Court has received,

18  which is really unique in itself, but with Mr. David, the

19  presentation today, the letters the Court has received, he has

20  family members here to speak about him as well, I think

21  everyone would agree that Mr. David is not a likelihood to

22  reoffend.  So punishment? Yes.  Rehabilitation? He might need

23  a little bit.  He plans to use his time for that.

24       But the other purposes of sentencing, I don't think

25  he's going to reoffend.  I think that's clear.  I don't think

1    society needs him incarcerated to, you know, prevent him from

2    further danger.  And he has suffered a punishment already.

3    He's a broken man.  He is a broken man.  There are no funds

4    left.  His wife is working full-time with three small children.

5    They're very educated.  They're smart.  They know the

6    cataclysmic -- cataclysmic effect on young children when a

7    parent disappears out of nowhere for a lengthy period of time.

8    The children actually never recover.  So there's a punishment,

9    yes, I understand that, Your Honor, but I think there's the

10   other aspects of sentencing that in this case really militate

11   toward the sentence we're requesting, which is substantially

12   below the guideline sentence the government is recommending,

13   which would be the same sentence as if Mr. David didn't do all

14   of these things, if they didn't get the money back, if he

15   hadn't have worked so hard to get the money back so quickly.

16   All of those things we've identified today are irrelevant if we

17   just give a guidelines sentence under the government's theory.

18   And I think that the factual record before the Court supports a

19   nonguidelines sentence.  And I'm going to submit it on that.

20           Again, ask the Court to just theorize down the road

21   four years from now if you took Mr. David out of prison would

22   the purposes of rehabilitation continue to be served by further

23   incarceration?  I think the answer is no.  Would the protection

24   of society continue to need him to be incarcerated?  I think

25   the answer is no.  So I want -- I'd ask the Court to consider

1    that.

2            And now Ms. Litwin has a summary of some of the

3    letters and some other items.

4            THE COURT:  Well, before you get to the letters, who

5    is going to address the statement in your brief about

6    Mr. David's intentions where you say that in the years when the

7    Sacramento Kings expected the money from Golden One and Kaiser

8    to come in, he intended to wire the money to the Sacramento

9    Kings?  And you state that it was his intention to sell the

10   properties when the Kings were expecting to receive the money.

11   I'd like you to tell me what your theory is as to what he

12   really intended to do.

13           MR. REICHEL:  I will.  And Mr. David will also tell

14   the Court.  But I'll just tell Your Honor as he was doing it,

15   it clearly softened the anxiety thinking about it -- his mind

16   thinking about it, softens his anxiety, softens his guilt, and

17   so he does know -- he does know how things work and that he

18   knows what due date -- exactly what due date these payments are

19   due.  Remember, they're due approximately six years down the

20   road on a certain date, I think it's June 1st or something like

21   that.  And they're installment payments of approximately

22   $500,000.  So when this happens, the individual involved knows

23   that --

24           THE COURT:  You're talking about two different things

25   here.  There's Golden One and there's Kaiser.  Which are you

1    talking about?

2           MR. REICHEL:  Yes.

3           THE COURT:  Golden One, they're not $500,000.  Golden

4    One, they're 6, 5 and 4 million dollars a year.

5           MR. REICHEL:  I'm sorry, Your Honor, but they are down

6    the road substantially.

7           THE COURT:  Well, they're starting in year one, and

8    then go all the way to year twenty.

9           MR. REICHEL:  I'm sorry.  I mixed them up with Kaiser

10   then.  I apologize.  Mr. David can explain.  There's was a

11   way -- well, look, the bottom line, as we've also said very

12   clearly is in hindsight it's not well thought out.  In

13   hindsight, it's not going to work.

14          THE COURT:  Well, but that gives -- that causes the

15   Court to question the credibility of the whole plan, whether

16   this is something made up after he got caught or whether this

17   is really his intention at the time.  And I wanted to ask you

18   about it because you point out it doesn't make any sense.  And

19   you also point out that Mr. David is an educated man and you

20   think these things through, and I want to know what his

21   intention was.

22          MR. REICHEL:  Thank you, Your Honor.  He'll address

23   the Court, but just -- they were the thoughts that were in his

24   mind.  Whether it obviously would have worked or not is

25   different.  And it also shows how poor his thinking was.

1          THE COURT:  Well, if it wouldn't have worked, it's not

2     a real thought in his mind, it's a fantasy.

3          MR. REICHEL:  I think it's just not well worked out.

4     I agree with the Court.  It is a fantasy.  But it was something

5     that was in his head at the time, and I think it shows -- it

6     shows his thinking, Your Honor.

7          THE COURT:  Let's go back -- that was the Golden One.

8     Let's go to Kaiser then.  You started to talk about Kaiser.

9          MR. REICHEL:  Yes.

10          THE COURT:  Kaiser, the United States Attorneys just

11     told me the plan was to pay $2.8 million a year for 10 years.

12     And the question was this inflationary adjustment of

13     4.4 million, which he took for himself upfront.  So you said

14     when it became due, he was going to make restitution or

15     payments to the Kings.  So what was the plan with regard to

16     Kaiser?

17          MR. REICHEL:  That he would wire the funds in, Your

18     Honor.

19          THE COURT:  When?

20          MR. REICHEL:  When they were due.

21          THE COURT:  Well, they were due every year, but the

22     amount that was due every year was $2.8 million, which was

23     consistent with the original agreement.  So when was he going

24     to mail it?

25          MR. REICHEL:  Well, it would be wired.  And I agree,

1    Your Honor, we're going to have to -- Mr. David can explain.

2    He's spoken to me about it, but I think he can explain it to

3    the Court.  It was -- you know, it was -- when the money was

4    purloined, he was thinking of ways that he would never be

5    caught.  I mean, the goal was to never have the Kings know the

6    money was gone.

7              THE COURT:  I cannot imagine a way that he would not

8    be caught.  So he's going to tell me this when he gets up here?

9              MR. REICHEL:  No.  He's not going to tell you that

10   it's the way to have never been caught, Your Honor, but he was

11   doing it and at times he was thinking that there must be a way

12   that the victims aren't suffering from this in the long run and

13   with some type of investment he would have funds to pay it back

14   and that it would always be secure.  That is one thing is that

15   it would always be secure.  These funds would always be secure

16   and they were.

17             THE COURT:  What about the money from X, Y and Z,

18   they're small sums and the companies I think are well known to

19   you.  What was the plan to repay that?

20             MR. REICHEL:  I don't know, Your Honor.  I don't know

21   if they were also going to be repaid at a later time when the

22   value of these properties went up.  I don't know if there were

23   thoughts about repaying on those, but I do know that at the

24   time that he was involved in purloining these moneys that he

25   was thinking there must be a way -- or hoping there must be a

1  way, I should say.

2          THE COURT:  All right.

3          MR. REICHEL:  Thank you, Your Honor.

4          THE COURT:  Ms. Litwin?

5          MS. LITWIN:  Thank you, Your Honor.  I'll be brief.

6      I was in charge of speaking to Jeff David's family,

7  members of the Sacramento community, his friends and receiving

8  letters.  And in this case, as you know, we received

9  approximately 60 letters.

10         THE COURT:  And I have read them.

11         MS. LITWIN:  Yes, Your Honor.  And these letters are

12  exceptional.  They were written by people who knew exactly what

13  Mr. David did but, despite that, because they knew the other

14  good qualities about him, wanted to write these letters anyway,

15  and that is significant.

16     And these letters all paint a vivid picture of the

17  other side of Mr. David.  They show, first of all, a man who's

18  truly remorseful.  As Mr. Seitles said, they discussed a man

19  that was broken and embarrassed, who was publicly humiliated

20  but somebody who never once shied away from responsibility.  He

21  never made excuses to anyone.  He owned what he did to all of

22  his family and his friends, which sometimes can be the hardest.

23     Secondly, they show a person who had a life-long

24  commitment to giving back.  These letters discuss somebody who

25  didn't just volunteer but actually made an impact on the lives

1    of everyone around him.

2            One of his former coworkers defined him as somebody

3    who everywhere he worked, he left a positive footprint on the

4    community in which he was based.

5            When he worked for the Kings, his coworkers described

6    somebody who pushed forward community initiatives, who created

7    a framework for several philanthrope programs at the Kings,

8    which raised hundreds of thousands of dollars for nonprofits.

9            THE COURT:  Not with his money, though, with the

10   Kings' money.

11           MS. LITWIN:  Of course not, Your Honor.

12           THE COURT:  Okay.

13           MS. LITWIN:  But that's what he did with his time.

14   When he was at the Kings, he pushed forward to help other

15   people in the community.  He didn't just work.  He also wanted

16   to make lives better for those around him.

17           THE COURT:  Was that his incentive, or was that

18   something the Kings asked him to do?

19           MS. LITWIN:  From the letters, Your Honor, it appears

20   that it was something that he pushed forward on his own.  And,

21   for example, speaking of that, there was a program that was

22   going on in the Kings called "Do Good Program," and he

23   personally led the leaderboard in volunteer hours.  So that was

24   not something the Kings asked him to do.  They asked everybody

25   to volunteer, but he was the highest person.  And he also

1   encouraged other levels, other people on the C level to

2   volunteer and to give back.

3           He personally was on the board of the American Heart

4   Association where he not just donated financially, but it was

5   his time.  It was what he gave back to the community.  And

6   these letters all describe somebody who took time to mentor

7   others.

8           You have two people that he supervised saying that he

9   was the most influential person in his career.

10          The letters describe somebody who always took time out

11  of his busy schedule to meet with somebody who was interested

12  in sports management.

13          We have a letter from his neighbor who was in college,

14  Mason, who he put an entire day together because he was

15  interested in working in professional sports.  This is somebody

16  who took the time to help others.

17          There's letters from people discussing his youth

18  coaching.  Somebody said that Mr. David is not somebody who

19  just does things to volunteer.  He truly wants to make a

20  difference in others' lives.  And when he was on that soccer

21  field, when he was coaching these kids, he didn't just show up.

22  He did a lot more.  Numerous letters described him as somebody

23  who brought the best selves out in these kids.

24          But the last thing the letters show is that Mr. David

25  is not just a father, he's an exceptional father to his three

1  young children, Murphy, who's 8, McKay who is 7 and Maddox who

2  is 4.  Mr. David has always been an amazing parent.  His

3  babysitter said it best.  She said, "He was one of the most

4  committed and involved parents I have ever known."  His nanny

5  said, "He's easily one of the best fathers I have ever seen."

6  These aren't statements to be taken lightly.

7       But I think the best sentiment to explain what kind of

8  a father he is that I read in I think five, maybe ten letters,

9  people saying that Jeff David was the first phone call they

10  made when they knew that they were going to be a father because

11  they wanted his advice.  They wanted to ask him how to be an

12  exceptional father.

13       And now Jeff David has become a stay-at-home dad.  The

14  letters describe somebody who makes smoothies at 4:30 a.m.

15  before swim practice, who's a volunteer reader at school, who

16  made home-made bunk beds and treehouses sledding course,

17  climbing entries.  This is somebody who has an indelible impact

18  on his three young children's lives and he has had an indelible

19  impact on the people around him that he has helped in his

20  community.  Thank you, Your Honor.

21       Your Honor, we do have three people from the community

22  that would like to speak on his behalf, if now would be a good

23  time.

24       THE COURT:  All right.  Do you want them to speak from

25  the witness stand or do you --

1          MR. REICHEL:  Right here, if that's --

2          THE COURT:  All right.

3          MS. LITWIN:  The first person, Your Honor, is Pastor

4    Frank Espegren.

5          THE COURT:  I know Pastor Espegren.  He was an

6    attorney in my law firm many, many years ago.

7          PASTOR ESPEGREN:  Good morning, Your Honor.  Yes,

8    that's true.  We knew each other a long time ago when I was in

9    another career.  Thank you for the opportunity to allow me to

10   speak on Jeff David's behalf today.

11         As a former attorney, it ends up, and as a pastor I

12   believe I have a rather unique perspective on an aspect of

13   this -- of this matter that may be helpful to the Court.  It's

14   really an evaluation of Jeff's character and conduct in the

15   months following the initiation of this proceeding.

16         Simply put, Jeff has expressed and lived into a deep

17   remorse for his conduct, a remorse so deep and so heartfelt and

18   sincere that I definitely can state that I've not really

19   experienced or seen anything quite like it before.  This

20   remorse was present from my very first interaction with Jeff

21   about this, those conversations, and has remained front and

22   center for him as he has processed the consequences of his

23   action, determined how best to mitigate his wrong and lived

24   honestly into the truth of his misconduct.

25         What I have seen and experienced in Jeff is far, far

1   more than regret.  Jeff is deeply sorry for his conduct and has

2   turned in a new direction to address, as best he can, the

3   brokenness he has caused by his deceitful acts.

4       Of course, a huge part of my work as a pastor is

5   leading of people into the beautiful significance of living a

6   good and a just life.  And really the most significant part of

7   that moral teaching is the fearless and intentional work that

8   is required after a moral compromise.  In my tradition, this

9   work falls under many rubrics:  Confession, repentance,

10  penance, forgiveness, all forms of remorse.

11      Jeff has fervently and faithfully and honestly, and

12  without hesitation, done this work.  It has been painful and

13  insisted on a massive and rewakening dose of humility, but Jeff

14  did not flinch.  Instead, it is as if he knew that the only way

15  back for him was to own this mess of his own creating.

16      My experience is that people talk about remorse more

17  than honestly live into it, and Jeff David is an exception to

18  that rule.  And I hope it can matter in the Court's sentencing

19  work that it can and will be taken into account that Jeff has

20  taken responsibility for his actions, addressed, as best he

21  could, a course of honesty and restitution, and that he has

22  worked to repair the damage caused by his breach of trust.

23  Jeff has persevered on this path of honest repentance, which

24  brings me before you today.  Therefore, as one of Jeff's

25  pastors, I humbly request the Court exercise as much discretion

1    as possible for leniency and mercy in the sentence.

2          Whatever your decision is, Your Honor, I am confident

3    that Jeff will accept his punishment.  I have the utmost

4    confidence that Jeff will not take advantage of any leniency

5    offered but, rather, will, to the best of his ability, use it

6    to fulfill his responsibilities in his life as husband and

7    father and citizen.  I believe that to his dying day Jeff will

8    obey all the laws of our land and not only that, from here on

9    out, Jeff will seek only to work for the good of our society

10   and all people who come within his sphere of influence.  Jeff's

11   remorse is true and it is real.  Jeff David has done, is doing,

12   and will continue to do that work.

13         And so I ask that your sentence reflect that truth

14   within the many considerations we entrust you with on our

15   behalf.  Thank you for the opportunity to speak to this, Your

16   Honor.

17         THE COURT:  All right.  Thank you.

18         MS. LITWIN:  Your Honor, Erin Hanley.  She was a

19   neighbor of Mr. David's in Sacramento, soon to be assistant

20   vice principal and, for what she speaks about today, a mother

21   of one of the members of Mr. David's soccer team.

22         Good morning.

23         THE COURT:  Good morning.

24         MS. HANLEY:  Oh, I'm nervous.  This is a new setting

25   for me, so forgive me as I try to take advantage of this time

1    wisely.  This is a hard space to show up to for a number of

2    reasons.  I've had a curious life working for a lot of nuns

3    that have brought me to the threshold of the criminal justice

4    system and especially serving children, so for me this is --

5    it's quite extraordinary to now make this klutzy journey up to

6    this podium as a friend who's listened now for this however

7    long you've shared the facts and really live truly in the space

8    of the person I've observed.  I know nothing of those things,

9    and somehow both of these things are true.

10         I am back in school getting a teaching credential.  I

11    have a master's degree in marriage and family therapy and,

12    burned out bearing witness to the darkness, thought I would

13    become a teacher and it would be less dark.  Of course, it's

14    not.  I'm in a Title 1 school right now in Citrus Heights and

15    chose to be here instead of with my Title 1 kids who have tummy

16    aches at summer school because it's new and that triggers all

17    their trauma.  So I'm showing up for families in the thick of

18    this terrible pain of mistakes and bad choices that they've

19    made.

20         I also called my husband's aunt, who's a nun, last

21    night and has worked in restorative justice and she said,

22    "Erin, you know that the space to begin is where there is hurt,

23    there's obligation and that -- can you tell me, talk to me

24    about that space with Jeff?"  And so we did.

25         And what's interesting about Jeff is, I met him just

1  so coincidentally moving here with a kid at four years old who

2  wanted to play soccer with a tired mom who didn't want to do

3  that, but we did it.  We signed up and went and Jeff happened

4  to be her coach.  So we were on gofer fields with this family.

5  And I watched this man show up three times a week for these

6  kids for three years.  And there's a certain preciousness to

7  witnessing early parenthood.  We are messy, we are undone

8  often.  There are kids that shoot to the wrong goal every

9  single time.  There are children that are crying, that never

10  want to leave their parent to enter the field.  There are

11  always shoelaces to be tied.  Jeff somehow never was rattled by

12  that.  It's a small thing, but it's not.  It's a consistent

13  ability to show up, to believe in the best in these kids in a

14  small field year after year that leads to more.

15          When Jeff and Kate were moving last year, I went to a

16  swim meet at just a humble pool.  Again, we're just in rec

17  sports world.  And Jeff and Kate -- I noticed them moving over

18  to the end of the pool to greet Murphy, their oldest, who was

19  in this meet, this -- we're not swimmers.  She was swimming the

20  pool.  And the way they were just watching her and eagerly

21  ready to greet her with this little towel, I took a picture of

22  it because it was just so darn tender and something that I

23  wanted to send my friend to remind them why I'm going to miss

24  them, to have people that we show up with humbly for our kids

25  in this community with.  That matters.  It leaves ripples.

1           For my own kid this year Jeff's gone and she loves
2   soccer in a way that I can't understand that Jeff probably can.
3   And she was just -- she hears his voice saying, "Go, Naomi."
4   And she said that when she had a real tough game, we're in the
5   car, I think she was crying about -- she was, like, all skinned
6   up and I think she was crying about that and it was that she
7   misses her coach.  And that longing, that missing, that
8   speaking to a truth about somebody who leaves an impression,
9   that deserves voice and is as true as all these other terrible
10  facts that you're also hearing.  So thank you for listening.
11          THE COURT:  Thank you.  And then lastly, Your Honor,
12  Dr. Nancy Schott (phonetic) and Dr. Rich Weber.  They are
13  Mr. David's in-laws.  They're going to stand together but only
14  one will speak.
15          MS. SCHOTT:  Good morning, Your Honor.  My name is
16  Nancy Shot.
17          MR. WEBER:  And my name is Rich Weber.
18          MS. SCHOTT:  We want to thank you very much for this
19  opportunity to share our heartfelt thoughts with you about
20  Jeffrey David.  We fear we will not find the words that will
21  adequately convey to you the depth of our love and support for
22  and belief in Jeff.  I hope that reemphasizing that he is our
23  son-in-law and not our biological son will help you understand
24  our struggle.  Likely it is difficult for you, as it was and is
25  for us, to believe that a talented, well-educated,

1   intellectually gifted man like Jeff could have been oblivious

2   to the extensive ramifications of his criminal actions.  It was

3   particularly difficult for us because we had previously been

4   witness to many occasions on which his strong moral compass was

5   in clear view in far less profound situations.

6        For some inexplicable reason in the case at hand, he

7   failed to use the good judgment that had guided him for 40 plus

8   years.  We can assure you, though, that his moral compass is

9   again on full display in his daily life.  Jeff's criminal act

10  has transformed him in many ways.

11       Upon meeting Jeff for the first time, we were struck

12  by his self-confidence, his personal and professional efficacy

13  and his incredible drive.  Now he is contrite, guilt ridden,

14  remorseful and morose.  Although he immediately admitted his

15  crime, he was also confronted with the fact that his admission

16  could not erase the scars left on his wife, three young

17  children and on his many extended family members and friends.

18       The impact of Jeff's crime on my daughter Kate has

19  been immense.  Her sense of security and safety have been

20  shaken.  She struggles to find peace and predictability in her

21  daily life.  She's terrified by what lies ahead for her and her

22  children.  She is overwhelmed by having the responsibility for

23  the family's financial and emotional stability.

24       We grieve even more for our three grandchildren who

25  are eight, seven and four.  They have become dependent on Jeff

1   over the past several months, as he has been their daily

2   caregiver since Kate had to return to full-time work.

3          It is fortunate, on the one hand, that they have had

4   an opportunity to grow closer to him because of his constant

5   presence, but we fear that his absence will be felt even more

6   deeply by them because of that.  They will soon experience many

7   of the same emotions that my daughter has, but they will not

8   have the life experience she has to help them deal with their

9   new life.  As a result, their recovery and period of

10  stabilization will be far more protracted and painful,

11  something no innocent child should have to endure.

12         In closing, despite all that we've delineated, we

13  harbor no bitterness or resentment toward Jeff.  The man Jeff

14  was before the crime, the man we have seen agonizing through

15  these last several months and the man we are confident he will

16  demonstrate to all that he is still is, is the authentic Jeff

17  David.

18         It quiets our hearts and minds to remind ourselves

19  that good people sometimes make bad decisions, but that doesn't

20  make them bad people.  It simply means they're human.  We hope

21  that the Court might find that reminder worthy of

22  consideration.  Thank you for your time and for allowing me to

23  address the Court.

24         Thank you, Your Honor.

25         THE COURT:  Thank you.

1          MR. REICHEL:  Your Honor, on the matter of -- I spoke

2    to Mr. Portanova, who's in attendance, and I also spoke to

3    Mr. Khasigian and it's on the matter of restitution and the

4    funds that are in a blocked account.  The blocked account has

5    approximately $397,000.  Mr. Khasigian has advised me that

6    money is being forfeited to the Department of Justice.  It's

7    held in an account.  The Kings, through Mr. Portanova, are

8    making a claim for $200,000 of it, which is what's left of

9    restitution.  The properties sold at 13.2.  We're looking to

10   get to 13.4 overall.

11         That blocked account was the Sac Sports Partnership

12   bank account, the government froze it.  Once Mr. Portanova get

13   the $200,000 out for the Kings, the government keeps the

14   balance because it was a frozen account that was -- it's

15   forfeited to the government is my understanding.  Am I correct,

16   Mr. Khasigian?

17         MR. KHASIGIAN:  Yes, Your Honor.  That is correct.

18         THE COURT:  So what does the government do with the

19   money?

20         MR. KHASIGIAN:  Well, as the government noted, there

21   are other victims that have been identified, I think the

22   29,000.  Similar to the process that we went through with the

23   Sacramento Kings and Mr. Portanova, those victims will be

24   available to file any documents that they wish to seek a

25   restoration of the funds that they lost.  That's our number one

1    intention.  And then the funds will be forfeited and any -- you

2    know, they could be, if there's money left over, be made

3    available to other victims of crimes that -- where there's not

4    restitution.  So that is the government's intent.

5            THE COURT:  All right.  You're not going to return any

6    of it to the defendant?

7            MR. KHASIGIAN:  We are not.

8            THE COURT:  All right.

9            MR. REICHEL:  And, Your Honor, I spoke to

10   Mr. Portanova.  He spoke to the probation department and the

11   government representing the victim, the Kings.  And in light of

12   all of this, he's advised me that he's advised probation and

13   the government as the, you know, attorney for the victims that

14   they're very very happy with Mr. David's conduct upon being

15   contacted by the FBI, and they're very happy with all of his

16   efforts to expeditiously and quickly return all of these funds

17   and --

18           THE COURT:  I think "satisfied" would be a better

19   term.

20           MR. REICHEL:  They're satisfied, Your Honor.  And as

21   Mr. Seitles pointed out, we don't often have that with victims.

22           THE COURT:  All right.  Now, have you said everything?

23   I wanted to give the government the opportunity to respond to

24   what counsel for the defendant have said, and then I want to

25   have Mr. David have the opportunity to address the Court.

1          Do you want to speak before Mr. David or after?

2          MR. YELOVICH:  Whatever the Court prefers.

3          THE COURT:  All right.  Did you have something you

4    want to say in response to counsel?

5          MR. YELOVICH:  Yes, Your Honor, just a few points.

6    First, starting with the point that Mr. Seitles and Mr. Reichel

7    made on the defendant's assistance and cooperation making this

8    an extraordinary case, as they called it.  The timeline that

9    they offered is missing some significant events that the Court

10   should be aware of.

11         First of all, everything that happened before

12   Mr. David reached out to Mr. Seitles I'm not going to go over

13   in detail, but the FBI and the U.S. Attorney's Office had

14   already amassed overwhelming evidence of Mr. David's guilt and

15   had frozen all of his accounts and put a lis pendens on the

16   properties.

17         So while he did come in and debrief and he did meet

18   with the victims and he didn't fight the forfeiture process,

19   the government would have proven his guilt beyond a reasonable

20   doubt without this box of documents he offered later or without

21   his cooperation on the forfeiture.

22         Indeed, the government set a -- on the forfeiture

23   specifically, the government vetted and did a background check

24   on the real estate agent that the government selected.  The

25   government set a price floor for offers.  The government

1    rejected several offers.  And while Mr. David should be

2    credited for signing the agreement to sell the properties and

3    for answering questions that buyers might have had, those are

4    not the same as offering some kind of extraordinary or

5    substantial assistance.  And as the Court pointed out, he had

6    every financial -- personal financial incentive to be

7    cooperative, to get the highest price for those properties, so

8    that he would not be on the hook later for restitution payments

9    amounting in the millions of dollars.

10         As for the statements that were made about his intent

11   to repay, I think as the Court was indicating in its questions,

12   this is simply not a plausible statement.

13         THE COURT:  They deferred to Mr. David for the answers

14   to those questions, so I'm going to ask him about it if he's

15   the one that is able to answer my questions.  And if you feel

16   that you have to respond over that, I'll hear what you have to

17   say.

18         MR. YELOVICH:  Thank you, Your Honor.

19         THE COURT:  Did you have anything to say with regard

20   to the cases that Mr. Seitles cited?  He seems to take the

21   position that courts regularly are lenient where somebody has

22   made restitution.

23         MR. YELOVICH:  Your Honor, the government cited the

24   well-known case *United States v. Treadwell*, where the Ninth

25   Circuit addressed this specific point saying that while

1    restitution is preferable and is among the interests that are

2    meant to be advanced at sentencing, it cannot supercede the

3    other considerations under 3553 that the Court is required to

4    consider.  And for the reasons stated in the government's

5    sentencing memorandum, while restitution is admirable in that

6    the victim is being made whole, that does not justify a lesser

7    sentence because to say otherwise, as the government pointed

8    out in the sentencing memorandum, would undermine respect for

9    the law.

10          I mean, you'd have a situation where a defendant who

11   could pay restitution would, in essence, be buying themselves a

12   lesser sentence, and that's simply not what Congress envisioned

13   in 3553, it's not what the Courts have stated are the purposes

14   of sentencing, and that's not something that we should promote.

15          As for some of the remaining points, I would just note

16   that this was not a crime that happened on one or two days or

17   were discrete actions that Mr. David accidentally took or

18   mistakenly took.  This was a long, sophisticated course of

19   conduct that required registering LLCs with the state, opening

20   commercial mailboxes in the LLC's name, using the identities

21   and the good names of prominent regional business people,

22   signing their names on LLC documents, unbeknownst to them, and

23   using their identities to commit this fraud.  And that type of

24   conduct is not an isolated bad decision.  It's a multiyear

25   sophisticated fraud scheme.  And that type of sophisticated

1    fraud scheme involving this large amount of money with this big

2    incentive to commit it requires a substantial sentence in order

3    to afford adequate deterrence.

4            THE COURT:  All right.  Thank you.  Now I will hear

5    from Mr. David.

6            MR. SEITLES:  Just before Mr. David speaks can I just

7    address one case that I cited to in our memorandum --

8            THE COURT:  All right.

9            MR. SEITLES:  -- which I think is relevant, Your

10   Honor?

11           Your Honor was discussing my argument for a

12   significant variance in light of the restitution, and I did

13   cite to a case in this district, *United States v. Mark*

14   *Reynolds*, 18-CR-0081.  In October of 2018, the United States

15   District Court -- Mr. Reynolds was indicted on five counts of

16   money laundering and 14 counts of mail fraud.  The fraud

17   occurred over a span of 8 years.  Prior to the trial, the

18   superceding information was filed and Reynolds pled guilty to a

19   count with a five-year maximum.  The money laundering counts

20   and the mail fraud counts were dismissed.  Reynolds paid back

21   all of the embezzled funds prior to sentencing but after

22   discovery.  This amounted to approximately $4 million.  Like

23   Mr. David, Reynolds had no prior criminal history, was married

24   and a father of young children, and Mr. Reynolds received a

25   sentence of straight probation.

1          So the reason for this, Your Honor, I'm not just

2    picking this out of thin air, but there is support certainly in

3    this district and also in the Ninth Circuit.  The case that we

4    cited, which there was an affirmance of a probationary sentence

5    in *United States v. Whitehead* at 532 F.3d 991, Ninth Circuit

6    2008.  Thank you, Your Honor.

7          THE COURT:  Mr. David.

8          MR. REICHEL:  Speak into this one.  I think this one

9    is louder.

10         MR. DAVID:  Good morning, Your Honor.  Thank you for

11   the opportunity to stand in front of you and speak.  And I do

12   want to thank so many of my friends and family that have come

13   here today, many of them from thousands of miles.  They've been

14   so helpful in this journey and to my wife who I've breached a

15   high level of trust and I work every day to try to build that

16   back.  What I did was wrong.  It was a crime.  I stand by that.

17   I expect to be punished.  I --

18         THE COURT:  If somebody had told you before you got

19   involved with this that they had stolen $13 million, what kind

20   of punishment do you think they would expect?

21         MR. DAVID:  If they stole it with the intention to

22   keep it and use it on something, they would go to prison.

23         THE COURT:  For how long?

24         MR. DAVID:  I don't know.

25         THE COURT:  All right.

1          MR. DAVID:  I don't know.

2          THE COURT:  So you're going to tell me why you didn't

3     intend to keep this money?

4          MR. DAVID:  Yes.  I never viewed it as my money.  I

5     did redirect the funds, and I had intended to repay the money

6     on July 1st of -- eight years from when I had taken it, once

7     the contract had started.  That's the amendment that we had

8     created.

9          THE COURT:  So you're talking about Golden One now?

10         MR. DAVID:  Yes.  But it was also simultaneous with

11     how I would return the Kaiser money as well.

12         THE COURT:  So what would happen after the eighth

13     year?

14         MR. DAVID:  I would be making payments in the Golden

15     One case.  They would owe 5.5 million that year.  I'm sorry.

16     They would owe 5.5 million, that's what the Kings would expect,

17     but Golden One, because of the amendment we created, would have

18     paid 5 million and the shortage of 500,000 I would have wired

19     into the same Kings account to make it whole --

20         THE COURT:  And --

21         MR. DAVID:  -- for that year.  And I would continue to

22     do that each year on July 1st.  I had the wire instructions.  I

23     knew how to provide the money to the Kings.

24         THE COURT:  That was your plan while you were still

25     with the Kings?

1          MR. DAVID:  That was my plan whether I was with the

2    Kings or not.

3          THE COURT:  So after you left the Kings, didn't you

4    think that whoever it was that took your place would think it

5    strange that a wire was coming in from Jeffrey David to pay for

6    a debt that wasn't his?

7          MR. DAVID:  No.  The accounting department and the

8    sales department don't talk like that.  They -- the accounting

9    department would simply receive money, one from Golden One in

10   this case and then I would have created a Golden One account --

11   Golden One only exists in California, and I could have created

12   a different account and wired it in.  So the accounting

13   department would have seen two wires coming in from an entity

14   called Golden One for the total that they had expected.

15         THE COURT:  So that would be what would happen for the

16   next five years or six years and then it would go up to a

17   million dollars a year, right?

18         MR. DAVID:  One year it was 1 million, and then I

19   think it went to 500.

20         THE COURT:  I think it was 1 million for four years,

21   but --

22         MR. DAVID:  Okay.

23         THE COURT:  -- be that as it may, where were you going

24   to get this money that you were going to wire in a million

25   dollars a year or even $500,000?

1          MR. DAVID:  From the sale of the properties.

2          THE COURT:  You were going to sell the property

3    then -- your plan was to sell the property after eight years?

4          MR. DAVID:  Or before.

5          THE COURT:  And so once you sold the property --

6          MR. DAVID:  I had eight years to sell it, but --

7          THE COURT:  You have eight years to sell it.  You

8    wouldn't have the property anymore, right?

9          MR. DAVID:  Correct.

10          THE COURT:  All you would have had would be the money

11   you got from the sale of the property?

12          MR. DAVID:  Correct.

13          THE COURT:  So that would have to net you several

14   millions dollars in profit before you could sock it away and

15   mail them another check every year, right?

16          MR. DAVID:  Okay.

17          THE COURT:  Right?

18          MR. DAVID:  Yes.  Yes.  Correct.

19          THE COURT:  And that was your plan?  After eight

20   years, you were going to make several million dollars of profit

21   by the sale of these properties?

22          MR. DAVID:  Yes.  I don't know if it would have been

23   that high, but I had intended to keep the profits and use that

24   for my kids' college education and retirement for my wife and

25   I.

1        THE COURT:  So you were going to have profits that

2  were going to provide for your children's education, money for

3  you and several million dollars to repay the money that you

4  owed to the Kings from the sale of that property after eight

5  years?

6        MR. DAVID:  Yes.  The principal was still there.  Once

7  I sold the homes, I would get the money that the homes -- the

8  excess.

9        THE COURT:  Right.  It would have to be several -- it

10  would have to be -- I could add it up.  It would have to be 1,

11  2, 3, 4, 5, 6, 7, 8 -- over $8 million in profit.

12        MR. DAVID:  No.  I don't think that would have been

13  that high.

14        THE COURT:  Well, we can go through the numbers, if

15  you want.

16        MR. DAVID:  Yes.  I mean, I owed 9 -- for

17  clarification, if it helps, I'm happy to do it, but for -- the

18  homes were purchased for cash.  And when I sold the home, I

19  would receive that same cash back plus profit.  So I would have

20  the original principal to pay the Kings back.

21        THE COURT:  Then you weren't going to be able to use

22  it for your family, as you said, or for --

23        MR. DAVID:  No.  I didn't want to use the principal

24  for my family.  I only was going to use the profits.  The

25  principal was going to go back to the Kings.

1      THE COURT:  So when you eventually sold the property,

2  do you know how much profit there was?

3      MR. DAVID:  When we actually sold them?

4      THE COURT:  Yeah.

5      MR. DAVID:  I think a few hundred thousand dollars.

6      THE COURT:  All right.  Go ahead.

7      MR. DAVID:  I think it's important that I also take

8  this time to apologize to the Sacramento Kings, the Golden One

9  and to Kaiser.  These people and companies are well respected

10 in Sacramento, and they were friends of mine, and I've wronged

11 them.

12      I looked at the day that the FBI came to my house not

13 as the beginning of the end but I wanted to make this the

14 beginning of my road to redemption and my comeback, if you

15 will.  I need to be able to look in the mirror.  I need to be

16 able to teach my three kids that I never wanted to be defined

17 by the crime I did commit but how I responded to this.  I've

18 tried to do the honorable thing.

19      I had opportunities to falsely accuse other people

20 that were involved, but that wasn't true, and I wasn't going to

21 do that.  I had no idea how much information the government had

22 on me when I flew out to California.  I know now that they had

23 quite a bit, but at the time I didn't know what they had.  And

24 my intention was to go in, explain how I did it and provide

25 boxes of files, electronic documents and hard copy documents to

1    give them anything they would need to build a case against me.

2    I did redirect this money.  I am not denying that.  My

3    intention was to put them into properties, sell them in the

4    future, return the money that was rightfully the Kings' on the

5    dates that the Kings had expected to receive the money, and I

6    was going to keep the profits.  That could have been $700,000,

7    a million dollars, I don't know.  The appreciation I think

8    would have helped and I did improve the properties, so I knew

9    that they would have been valuable.

10         It was incredibly selfish and stupid, and when I look

11   at the devastation I've caused my wife and my kids and my

12   parents and brothers and friends and family, I've lost the

13   respect I had.  I have lost the job and a career that I loved

14   and I excelled in.  But I care less about what has happened to

15   me and I care more about making sure I've done the right thing

16   for the people that I offended and that I've hurt.  It was not

17   right for me to do this, and I've tried to wake up every day

18   demonstrating that I am an honorable person and I needed to

19   make it right.

20         THE COURT:  Do you -- do you -- I'm just asking you

21   for -- do some introspection here yourself.  Do you think if

22   you had not gotten caught you would have the same remorse?

23         MR. DAVID:  I never wanted to keep the money.  I tried

24   on two different occasions while I still worked for the Kings

25   to get it back and I asked the Kings if they needed an advance.

1    There were articles written in the media about cost overruns on

2    the arena and I asked -- I didn't get to see.  I was a sales

3    and marketing revenue generator.  I didn't write the checks and

4    pay the bills, so I didn't know what the Kings' bank account

5    was.  I didn't know if we really needed the money or not, I.

6    was just reading the local paper.

7            And I could have sold the properties, that was my

8    intention, and I could have given them the money right away,

9    but they didn't need that advance and I couldn't just show up

10   and give them $13 million, so -- without getting caught, so

11   I -- I just wanted it over.

12           So now that I'm here and I'm standing in front of you,

13   I wish I wasn't, but I'm happy that everybody's got their money

14   back.  I'm happy that I've come clean.  I'm happy that I've

15   tried to be honest and honorable and I have friends and family

16   that have been supportive and they're still by my side and I'm

17   thankful for that.  I'm thankful that my wife hasn't left me,

18   which she could have easily done.  It was stupid.  It was

19   stupid.  And when I look back, I can't believe what was going

20   on in my head at that time.  I think more clearly now.  I've

21   had almost a year of trying to get through self-loathing and

22   turn it into self-introspection, and I'm just -- I'm trying to

23   focus on the things that make me a better father, a better

24   husband, a better partner to my wife and make sure that I've

25   righted the wrongs that I did commit.  And I've had 10 months

1    to do that.  And I'm thankful that I've been able to do so.

2          THE COURT:  All right.  Did you want to say anything

3    else before the Court takes this under submission?

4          MR. YELOVICH:  Yes.  Thank you, Your Honor.  This

5    "intent to repay" position is just completely unsupported by

6    the record, and it shows that the defendant is still standing

7    here today struggling with acceptance of responsibility.

8          The spending habits, some of which are detailed in the

9    factual basis, include spending lavishly on private jet travel,

10   tens of thousands of dollars on personal credit card repayment

11   out of this money that was taken.

12         THE COURT:  But apparently he is correct that there

13   was enough money there that eventually when the property was

14   sold, it was enough to pay off everything he had stolen with

15   some left over.  So he is correct there.

16         MR. YELOVICH:  That after-the-fact rationalization is

17   possible, assuming that the market conditions improved.  He

18   doesn't answer the question of what happens if we had another

19   recession or at least a correction of the real estate market in

20   Southern California.

21         And as the government pointed out in the sentencing

22   memorandum, it really doesn't speak to culpability at all to

23   say that because he was caught when the real estate market was

24   still on an upswing he should be credited with that.

25         THE COURT:  What about this Eastern District case

1    Mr. Seitles repeatedly cites to the Court?

2            MR. YELOVICH:  I'm unfamiliar with the specifics from

3    the PSR in that case, but I will note for the record that the

4    guidelines for the cases, both that case and *Whitehead* that the

5    defense cites are nowhere near what the guidelines ranges are

6    here.

7            The *Reynolds* case the defendant pled to a 60-month

8    statutory maximum, and that's simply not anywhere close to the

9    guidelines range that this defendant faces.  And so citing

10   those for the proposition that he should also receive that type

11   of leniency is comparing apples and oranges, to a certain

12   extent.

13           The last thing I will say is even if one believed this

14   intent to repay, that all along he intended on repaying the

15   money, it still begs the question of culpability because he was

16   going to repay the money after the statute of limitations had

17   expired for his conduct.  And so I'm -- it's unclear to me why

18   he should be credited with this after-the-fact rationalization

19   that he has come up with that is unsupported by the record and

20   is contrary to the facts in the factual basis.

21           Thank you, Your Honor.

22           MR. REICHEL:  Your Honor, just briefly on *Reynolds*,

23   that case was litigated to the eve of trial in Fresno.  The

24   docket reflects that.  There were motions to dismiss and so

25   forth, and on the eve of trial they cut this deal.  The

1    government sought the maximum and Mr. Reynolds prevailed with

2    the defense counsel in front of the judge and got nothing.

3              THE COURT:  I don't know enough about that case.  If I

4    really wanted to know about that case, I'd just call Judge

5    O'Neill and ask him what happened, but I don't think that is

6    either appropriate or necessary.  I was just asking if the

7    government had anything to say in response.

8              This Court has to make its own determination and it's

9    an individual determination that has to be made in each case

10   based upon the facts and circumstances of that case.

11             Is there anything else before the Court pronounces

12   judgment?

13             MR. REICHEL:  We do want to talk about a designation,

14   Your Honor, when we're done that we'll ask for.

15             THE COURT:  All right.

16             Well, I asked Mr. David this question and I think if

17   you were to ask any number of people what the punishment might

18   be that they would expect to receive if they stole $13 million,

19   I think without exception they'd all tell you that they would

20   expect to receive a substantial, lengthy jail sentence.

21   Anything less would be unfair to all of those who obey the law

22   and depend upon the courts to enforce the laws, and I think

23   anything less would also be insufficient to deter others who

24   might be inclined to do the same thing.

25             The Court has heard from three individuals and I've

1    read all of the letters.  I believe that when someone takes the

2    time to write a letter to the Court, the Court should read it

3    and I have.

4           Many of those people I think must be here today.

5    You've expressed your opinion that Mr. David is a good man,

6    that he's learned his lesson and that he won't do something

7    like this again.  You've told me that you don't believe that he

8    poses a future danger to society.  Those are all relevant

9    factors, and the Court takes them into consideration, but there

10   are other factors that the Court must consider under Section

11   3553(a) of Title 18 United States Code, and I don't think any

12   of the letters have adequately addressed some of them.  The

13   seriousness of the offense.  I've said it's a theft of $13

14   million.  Mr. David has taken the position that he never

15   intended to keep it, that he always intended to return it.  If

16   that were true, that would be also a relevant consideration.

17   But I must say that that story doesn't -- doesn't -- it's not

18   credible.  It's not worthy of belief.  I don't believe that

19   that was his intention.  Doesn't make sense.  It's more likely

20   that he hoped it would all go away and that he wouldn't have to

21   repay it but that he knew that if he ever got caught and he had

22   to make restitution, he'd be able to do so because he could

23   sell the property.  But I just have a hard time believing that

24   that was his intention from the very beginning.  I'm sorry.

25          Mr. Seitles has said this was a horrible thing that

1    Mr. David did.  Well, one of the factors that the Court must

2    take into account is the seriousness of the offense, the need

3    to promote respect for the law.

4         His mother-in-law referred to the extensive

5    ramifications of his criminal actions.  If others are to be

6    deterred from even thinking about doing something like this

7    again, there has to be a substantial sentence to deter them.

8    One of the sentencing factors is to provide just punishment for

9    the offense, and that's what the Court has to consider.

10        Now I'm left with the question of whether I sentence

11   within the guidelines, as the United States Attorney has

12   suggested, or something less than those guidelines.  I think a

13   lengthy prison term is necessary, but I think perhaps something

14   less than the guidelines may be sufficient.

15        And the Court needs to take into consideration the

16   fact that he's made the restitution, albeit after he was

17   caught, that he's cooperated with the government in that

18   regard, saved the government the effort and that his

19   incarceration will harm his family.

20        One of the judges I used to work for always said it's

21   always the family that pays.  The defendant will go to prison,

22   he'll have a warm place to stay, three meals a day, and it will

23   be the family that he leaves at home that will suffer.  And all

24   I can say about that was, you need to take that into account

25   before you do something like this.

1    The Court has considered the guidelines and all of the

2 relevant sentencing factors and pursuant to the Sentencing

3 Reform Act of 1984, it is the judgment of the Court that the

4 defendant is hereby committed to the custody of the Bureau of

5 Prisons to be imprisoned for a term of 78 months on Count 1 and

6 24 months on Count 11 to be served consecutively for a total

7 term of 84 months in prison.

8    MR. REICHEL:  That math didn't add up, Your Honor.  If

9 the total term is 84, Your Honor, it would be 60 months on

10 Count 1.

11    THE COURT:  Well, that's what I get for trying to do

12 math here.  It is 60 months.  I want the total term to be 84.

13 60 months is 5 years, and I feel that that is the term -- thank

14 you for calling that to do my attention, Mr. Reichel.  I think

15 that that is a term that is sufficient but not greater than

16 necessary to satisfy all of the sentencing factors in Section

17 3563(a) -- 3553(a) for a total term of 84 months.

18    In light of the discussion that we've had here, the

19 Court does not believe that a fine is appropriate after the

20 restitution is made and the government forfeits the sums that

21 it has received.  I don't believe the defendant will be able to

22 pay a fine and, therefore, the imposition of a fine will be

23 waived.  He shall pay the special penalty assessment of $200,

24 however, payment to begin immediately.

25    Do you want me to make the restitution finding now, or

1    is the government just going to do that?

2         MR. YELOVICH:  We'd like you to order restitution,

3    Your Honor.

4         THE COURT:  All right.  Well, the defendant shall pay

5    restitution to the victims in the amount of $13,400,000, as

6    outlined in the restitution attachment to the presentence

7    report.  That will be sent to the Clerk of the Court, who will

8    forward it to the victims.  Restitution due during imprisonment

9    shall be made at the rate of $25 per quarter, and payment shall

10   be made through the Bureau of Prisons.

11        The preliminary order of forfeiture is hereby made

12   final as to this defendant and shall be incorporated into the

13   judgment.

14        Upon release from imprisonment, the defendant shall be

15   placed on supervised release for a term of 36 months on Count 1

16   and 12 months on Count 11, to be served concurrently, for a

17   total term of 36 months.

18        Within 72 hours of release from the custody of the

19   Bureau of Prisons, the defendant shall report in person to the

20   probation office in the district to which he is released.

21        While on supervised release, the defendant shall not

22   commit another federal, state or local crime, shall not

23   illegally possess controlled substances and shall make

24   restitution in accordance with Section 3663(a) and 3663 of

25   Title 18 United States Code or any other statute authorizing a

1    sentence of restitution.

2           He shall cooperate in the collection of DNA, as

3    directed by the probation officer, and shall comply with the

4    standard conditions which have been recommended by the United

5    States Sentencing Commission and adopted by this Court.

6           Now, Mr. Reichel, have you gone over the special

7    conditions listed on page 23 of the presentence report with

8    Mr. David?

9           MR. REICHEL:  Yes, we have, Your Honor.  We have no

10   objections.  He understands them.

11          THE COURT:  All right.  Mr. David, do you understand

12   the special conditions on page 23 of the presentence report?

13          MR. DAVID:  I do, Your Honor.

14          THE COURT:  The Court adopts the special conditions

15   recommended by the probation officer on page 23 of the

16   presentence report and imposes all of those listed as special

17   conditions.

18          You wanted to make a special request for the place of

19   confinement?

20          MR. REICHEL:  We did, Your Honor, if I could just have

21   one moment with Mr. David.

22          Thank you, Your Honor.  There is a federal institution

23   in Morgantown, West Virginia, which is close -- which is close

24   enough to Mr. David's family home and family in Ohio.  It also

25   has the drug treatment program, the residential drug after-care

1   program.  I would ask the Court to make that recommendation as

2   well.  The probation officer I think -- I believe made that

3   recommendation in the report as well.

4           THE COURT:  For the drug program?

5           MR. REICHEL:  Yes, for alcohol.  And --

6           THE COURT:  Does he still have an alcohol problem?

7           MR. REICHEL:  He certainly did at the time, Your

8   Honor.  I don't think -- he had an individual problem at the

9   time that was the contributing factor we believe, so -- and

10  he's -- he has drank.

11          THE COURT:  I'm going to leave that to the Bureau of

12  Prisons.  I think they can make their own assessment.

13          MR. REICHEL:  That's fine, Your Honor.  And we'd ask

14  for the designation to Morgantown, West Virginia.

15          THE COURT:  All right.  The Court will recommend that

16  Mr. David be incarcerated at the federal institution at

17  Morgantown, West Virginia, insofar as this recommendation

18  accords with security classification and space availability.

19          So that there's no question about the Court's

20  intention, because I misspoke the sentence at first, the

21  Court's sentence is 78 months on Count 1 and 24 months on Count

22  11 to be served consecutively for a total sentence of 84

23  months.

24          MR. REICHEL:  We believe that it would be 60 on Count

25  1, Your Honor, plus the 24.

1          THE COURT:  Right.  All right.  I'm sorry.  That's it.

2    All right.  I'm sorry.  Yes.  That's correct.  60 months on

3    Count 1 and 24 months on Count 11.  All right.  Thank you.

4          MR. REICHEL:  So, Your Honor, there's also -- the

5    government's going to mention the waiver of appeal.  We would

6    ask the Court for a date for self-surrender as well.

7          THE COURT:  All right.  Did he waive his right to

8    appeal?

9          MR. REICHEL:  It's in the plea agreement.

10          THE COURT:  All right.  Any objection to

11    self-surrender?

12          MR. YELOVICH:  No objection, Your Honor.

13          THE COURT:  All right.  What date do you suggest?

14          MR. REICHEL:  Approximately 10 weeks out.

15          THE COURT:  Why 10 weeks?

16          MR. REICHEL:  It seems to be that's what the Bureau of

17    Prisons has asked for in the past, 8 to 10 weeks, so --

18          THE COURT:  All right.  So what date do you suggest?

19          MR. REICHEL:  Is there a Tuesday in September then or

20    late August?  I didn't get my calendar out.

21          MR. YELOVICH:  The PSR suggests the date of August

22    19th, Your Honor.

23          THE COURT:  All right.  I think there was some time

24    they said they didn't want it on Mondays, I don't know why, so

25    we'll make it the 20th.

1   Mr. David is ordered to turn himself in by 2:00 p.m.

2 on August the 20th to the institution to be designated by the

3 Bureau of Prisons.  If no institution is designated by that

4 time, Mr. David is ordered to turn himself in to the United

5 States Marshal in this building.

6   Mr. David, the reason I had a hard time with the

7 arithmetic is that I don't make up my mind as to the sentence

8 until I come out here and I hear from everybody.  And I could

9 have sentenced you to a greater term, as recommended by the

10 United States Attorney, but it was what you had to say, what

11 your attorneys had to say and what the people had to say on

12 your behalf that caused me to sentence you to something less,

13 so you should understood understand that.

14   MR. DAVID:  Thank you.

15   THE COURT:  Anything else?

16   MR. YELOVICH:  Nothing from the government, Your

17 Honor.

18   Oh, I'm sorry, Your Honor.  The government moves to

19 dismiss the remaining counts in the information pending against

20 this defendant.

21   THE COURT:  All right.  That motion is granted.  Those

22 counts are dismissed.

23   MR. REICHEL:  Thank you, Your Honor.

24  (Concluded at 10:39 a.m.)

25

C E R T I F I C A T E

    I certify that the foregoing is a true and correct transcript of the record of proceedings in the above-entitled matter.

/s/ JENNIFER L. COULTHARD                October 24, 2019
                                              DATE

JENNIFER L. COULTHARD, RMR, CRR
Official Court Reporter